**UNITED STATES of America, Plaintiff–Appellant,**

**v.**

**Dominic CORTINA et al., Defendants–Appellees.**

**No. 79–2226.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1980.

Decided Sept. 11, 1980.

Julian Solotorovsky, Asst. U. S. Atty., Chicago, Ill., for plaintiff–appellant.

---

John C. Tucker, Jenner & Block, Chicago, Ill., for defendants–appellees.

Before FAIRCHILD, SWYGERT and BAUER, Circuit Judges.

BAUER, Circuit Judge.

The government appeals from an order of the district court suppressing certain evidence obtained in a search pursuant to a search warrant. The trial court found, and the record supports, the following facts: William I. Brown, an agent for the Federal Bureau of Investigation, deliberately lied in an affidavit presented to support the search warrant. There was no probable cause for the search without the facts misrepresented by Brown. The district court suppressed all the evidence resulting from the search. We affirm; this Court will not condone a fraud upon the judicial system.

## I.

The twelve individual and two corporate defendants here were indicted for racketeering, extortion, and illegal gambling in connection with two race track messenger services, Mr. Lucky's Messenger Service (Mr. Lucky's) and Finish Line Messenger Service (Finish Line).[1] The indictments were the result of an investigation conducted over several years by the Federal Bureau of Investigation (FBI) and the Internal Revenue Service (IRS).

As part of his investigation of the messenger services, FBI Agent William Brown contacted Pamela Bridges, a former employee of Mr. Lucky's, in late March 1977. He showed her pictures of the individual defendants, and asked if she could identify them and explain their jobs at Mr. Lucky's. Tr. 482–84. Bridges recognized most, but not all, of the individuals. Tr. 493, 496. From time to time thereafter Brown had conversations with Bridges in which she described other individuals at Mr. Lucky's. Brown reported the substance of his conversations with Bridges on contact sheets.

In June 1977, Bridges began working at Finish Line Messenger Service. She continued talking with Brown, and was then able to identify additional persons who she discovered worked at Finish Line. Tr. 493, 496. Bridges received a total of $3,400 for the information she gave Brown. Tr. 464.

On April 22, 1977, FBI Agent Linda Stewart presented Magistrate Jurco with an affidavit in support of warrants to search defendants William McGuire, Michael LeDonne, and the main offices and recap offices of Mr. Lucky's and Finish Line. The warrants called for seizure of:

all instrumentalities, implements, and apparatus, certain betting records and wagering paraphernalia consisting of, but not limited to, accounting sheets, tape recordings, adding machines, telephone numbers, [and] telephone records.

Stewart did not have personal knowledge of most of the information in the affidavit. Instead, she swore that a "confidential informant" referred to as "Source Number One" "told Special Agent William I. Brown . . . who in turn told me" the information contained in the affidavit. Stewart supported the reliability of the informant by stating that

---

1. The United States Attorney filed a fifteen count indictment on February 1, 1979, against Finish Line, Mr. Lucky's and twelve individual defendants: Dominic Cortina, Richard Piekarski, William McGuire, Ralph Carbonari, Bernard Posner, Raymond Brown, Leonard Danner, Frank Esposito, Michael LeDonne, Leonard Mondia, Walter Rhodes, and Jacqueline Ross. The indictment charges four specific types of federal violations. Count One charges five defendants with conspiracy to violate the Racketeer Influenced Corrupt Organizations statute (RICO), 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d), by unlawfully operating, controlling, and acquiring bet messenger services. Counts Two and Three charges these five defendants and others with conducting illegal gambling businesses in violation of 18 U.S.C. § 1955. Counts Four and Five charge certain defendants with committing extortion in violation of 18 U.S.C. § 1951. Counts Six through Eleven charge certain defendants with being engaged in the business of accepting wagers and failing to register and failing to pay the special occupational tax, in violation of 26 U.S.C. § 7203. Counts Twelve through Fifteen charge two defendants with obstruction of justice and perjury. These counts were severed by the court on August 30, 1979, and will be tried at a later date.

Source Number One has furnished information regarding the identities of numerous individuals allegedly engaged in illegal gambling activities. Most of this information has been corroborated by independent investigation by Special Agents of the Federal Bureau of Investigation and officers of the Chicago Police Department including examination of police arrest records, physical observations and comparison with information received from other confidential sources.

The affidavit recited many "facts" allegedly obtained by Source Number One through "observation and personal conversations" with many of the defendants. The affidavit stated that several of the defendants had admitted to Source Number One that they were not in fact acting as messenger services, but were "booking" a large portion of the orders that the public placed with them. As it was later learned, Source Number One was Pamela Bridges.

Based on the affidavit, Magistrate Jurco issued the search warrants at issue here. When the warrants were executed on April 22, 1977, FBI agents seized hundreds of boxes of items and papers from the main offices of Mr. Lucky's and Finish Line. The agents took virtually every scrap of paper at each location, including thousands of dollars. The warrant for the personal search of William McGuire was executed on McGuire on the premises of Finish Line.[2]

After the indictment was filed, the defendants moved to suppress the results of the searches on the grounds that many of the documents seized were outside the scope of the warrants. The defendants also argued that the warrants were supported by a false affidavit. In support, they attached the affidavits of several of the defendants who swore that they had never said any of the things attributed to them by Source Number One. The defendants requested a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine whether government agents misrepresented information in the affidavit.

Judge Decker denied the motion to suppress on June 27, 1979. He held that the defendants' affidavits did not establish that the government did not receive the information in the affidavit, but only that Source Number One may have lied or exaggerated when providing the information.

There matters rested until September 11, 1979, the day before trial was to begin. As part of its final pretrial preparation, the government had received the FBI informant file on Pamela Bridges. The file included Agent Brown's contemporaneous reports of his meetings with Bridges, a portion of an FBI administrative file, and Bridges's grand jury testimony. Since the government expected to call Bridges as a witness, it gave portions of the file to the defendants pursuant to the Jencks Act, 18 U.S.C. § 3500. The government also delivered the additional materials to Judge Davies (to whom the case had been reassigned) with a letter reciting that "[b]ased on our review of the file, we anticipate that the defendants may renew their motion to suppress the evidence and the accompanying motion for an evidentiary hearing."

The government had understated its concern. Brown's contact reports and Bridges's grand jury testimony supported almost none of the information attributed to Source Number One in the April 22 affidavit. Information in eight of the affidavit's fourteen paragraphs was not supported by material in the file. These eight paragraphs stated that Source Number One had obtained, on dates specified in the affidavit, the following information from various defendants at Mr. Lucky's and Finish Line:

(a) through observation and personal conversations with [defendants] Raymond Brown, Michael LeDonne, William McGuire and individuals associated with McGuire, that McGuire is in charge of handicapping and booking 75% of all horse racing bets called into the Finish Line Express Messenger Service located at 506 West Van Buren;

---

**2.** The personal search of Michael LeDonne is not at issue because the government has indicated it does not intend to use anything taken from him in evidence.

(b) that McGuire had told Source Number One that the bets handicapped by McGuire are retained in private bookmaking operated by McGuire and his associates. The remainder are sent to local race tracks for placement in the pari—mutuel wagering system;

(c) that Source Number One, while present at 506 West Van Buren, had learned through conversations with persons employed by Finish Line and through personal observations that five Negro females are employed as clerks at 506 West Van Buren and these women record on cassette tapes all bets called into the main office. The tapes are then transcribed on paper by women and given to McGuire or Ralph Carbonari. McGuire and Carbonari handicap all bets and determine which bets will be sent to the local race tracks to be bet and which will be kept for their own bookmaking;

(d) that Source Number One learned, through several personal conversations with Carbonari and McGuire, that Finish Line Express Messenger Service was handling approximately $40,000 worth of horse bets per day and would send only $10,000 worth of these bets to the local tracks;

(e) that McGuire said in substance to Source Number One that he continues to determine what bets are to be placed at the local tracks and which are to be kept for the private bookmaking business run by McGuire and his associates;

(f) that Source Number One had learned, through observations and personal conversations with Michael LeDonne and individuals employed at Mr. Lucky's Messenger Service, that LeDonne is in charge of handicapping and booking approximately 75% of all horse racing bets called into Mr. Lucky's Messenger Service;

(g) that Source Number One had learned, through personal conversations with Michael LeDonne, that generally Mr. Lucky's Messenger Service handles approximately $20,000 worth of bets from its twelve storefront Mr. Lucky's Messenger Services on a daily basis and of this only approximately $5,000 worth of bets were placed at the race tracks;

(h) that Source Number One had learned, through personal conversations with Sandra Fankaway, Faye Conley, Carla D. Allen, Gwendolyn Last Name Unknown, and others, that they have personal knowledge that not all bets placed are sent to the race tracks to be bet, but that some are kept and applied to the bookmaking business operated by McGuire and his associates.

Only two of the affidavit's remaining paragraphs alleged any incriminating information. The rest contained material identifying the defendants' names and positions.

Defense counsel submitted the list of inconsistencies they had discovered to the district court. All the defendants moved for an evidentiary hearing, and Judge Davies granted the motion.

Three witnesses testified at the three—day evidentiary hearing: Linda Stewart, who was the former FBI agent who prepared the affidavit, Agent Brown, and Pamela Bridges. The testimony of all the witnesses revealed that significant portions of the affidavit were false.

Stewart stated that she worked closely with Agent Brown in preparing the affidavit, and that he had reviewed the draft as well as the final version. Tr. 36–38, 100. Stewart testified that she had neither met nor talked to Source Number One and that she did not know Agent Brown was paying Source Number One for her information. Tr. 31–32, 76, 95–96, 98–99.

Stewart explained that she prepared the draft of the affidavit by referring to Agent Brown's reports. Tr. 35–36. Further changes were made after the draft was reviewed by Chicago Strike Force Attorney Kenneth Lowrie. Tr. 37, 118. Stewart testified that Lowrie told her the affidavit should state with whom any conversations were held. Tr. 56–57. When Stewart told Brown that additional information was needed, Brown told her that he would get it from the source. Tr. 111. Stewart stated that it was "likely" that any information not in the draft was obtained as a result of

phone calls by Brown to Bridges. Tr. 89. Stewart testified that she did not provide any additional information without consulting Brown. Tr. 121.

Stewart was asked to compare her handwritten draft of the affidavit with both Agent Brown's contact sheets and the final version. She admitted that the substance of the above eight paragraphs was not supported by the contact sheets. Tr. 54–58, 61–5, 70–71. She further admitted that paragraphs (c), (e), and (h) were changed in the final affidavit to be substantially more incriminating than those in her draft.[3] Tr. 64–66. She further testified that paragraph (b) above could not be found in either the contact sheets or her draft, but appeared only in the final form of the affidavit. Tr. 54–55.

Agent Brown took the stand next, and was confronted with each of the alleged inconsistencies. Brown's testimony was evasive and equivocal. He said that he was not sure, could not remember, or could not recall in response to almost every question put to him.

Brown was first questioned about the reliability section of the affidavit, described at page 1208 *supra*. He could not recall whether he had other sources of information to corroborate Bridges's information used in the April 22 affidavit, although the affidavit said that he did. Tr. 169–171. When confronted with an FBI internal report he prepared, Brown admitted that it stated that Bridges was the only source he had. Tr. 174, 176–177. He also conceded that the affidavit's claim that Bridges "has furnished information regarding numerous individuals" referred only to the defendants here. Tr. 177. He also admitted that he had once falsely reported to his superiors that Bridges's information had resulted in four convictions. Tr. 403–04.

In the course of his full day of testimony, Brown admitted that his contact reports did not substantiate the most serious allegations in the affidavit. *See, e. g.*, Tr. 189, 234, 246, 249, 253. Brown admitted that he gave the information to Stewart. He "recalled," however, that Bridges had told him the missing information. Tr. 249–50, 251–53. He claimed that he did not make written reports of everything that Bridges told him, although he admitted that the omitted information was important and critical. Tr. 186–87, 243, 252, 263. Some of the conversations allegedly occurred on days for which he did make written reports of contacts with Bridges. The reports for those days do not mention the conversations. *E. g.*, Tr. 260–61. He did insist that Bridges told him McGuire had told her that McGuire was booking bets. Tr. 183–184. When Bridges testified, however, she denied that she ever had such a conversation with McGuire. Tr. 501, 557, 569.

The April 22 affidavit attributed to Bridges extensive knowledge of the operations and personnel at Finish Line (paragraphs (a), (c), and (d) above). Tr. 221, 223–35. Brown admitted that he knew that Bridges did not become employed at Finish Line until June, several months after the April 22, 1977 affidavit and after the search of Mr. Lucky's and Finish Line. Tr. 225. Bridges later testified that, until she went to work there, she had never been to the Finish Line offices at 506 West Van Buren (paragraph (c) above) and knew nothing about Finish Line. Tr. 468–69, 496, 506–07.

Brown ultimately admitted that the allegation in paragraph (d) (above), that Carbonari and McGuire told Bridges that Finish Line Messenger Service sent only one quarter of its bets to the track, was false. When asked where Linda Stewart got the information for that paragraph, he stated it "would possibly have been me." Tr. 234–37. He also finally admitted that the affi-

---

3. For example, Stewart's handwritten draft states that "Source Number One indicated that McGuire continues to determine what bets are to be placed at the local tracks." The final affidavit states

Source Number One stated that McGuire said in substance that he continues to determine what bets are to be placed at the local tracks, and which are to be kept for the private bookmaking business run by McGuire and his associates.

davit falsely asserted that Bridges told him, during the week of April 10, that she had had a conversation with McGuire in which he stated that he continued to determine which bets were to be placed at the tracks and which were to be kept for his private bookmaking business (paragraph (e) above). Brown stated that to "the best of my recollection" he did not make that statement to Agent Stewart. Tr. 243–49.

On cross–examination by government counsel, Brown admitted that he was in daily contact with Agent Stewart during the preparation of the affidavit and that Stewart asked him on several occasions to contact Bridges to obtain further information for the affidavit. Tr. 421–26. He also again admitted that the two paragraphs of the affidavit were false, but stated that he did not know how they became part of the affidavit. Tr. 427.

Pamela Bridges was the final witness. She recalled that Brown had made some assertions that Mr. Lucky's was not sending all of the orders to the track. She could not recall whether she responded to his statements. Tr. 490–91. Her description of what she discussed with Brown substantially matched what was reported in the contact sheets. Bridges was sure, however, that she never had any of the incriminating conversations attributed to her in the affidavit. She also denied she ever told Agent Brown that she had any such conversations. Tr. 501–03, 569–70.

At the conclusion of the evidentiary hearing, Judge Davies found:

> During the course of these proceedings it has become very clear to this Court that the testimony of Agent William I. Brown was just short of incredible; and it follows that the Court is of the opinion that a great share of the information furnished to Agent Linda A. Stewart by Agent Brown, who knew that the information was to be used by her in an affidavit to establish probable cause for the issuance of a search warrant, was false.

Tr. 583.

Thereafter, Assistant United States Attorney Groark argued to the court that the only two things which had been shown to be false were the two statements which Agent Brown had himself admitted to be false, and that the defendants had not shown any willful, intentional, or reckless conduct on the part of Agent Brown. Mr. Groark then asked the court to point out those portions of the affidavit that the court deemed to be false so he could argue that there was sufficient information to support a finding of probable cause. Tr. 584–601. The court responded:

> The Court: Mr. Groark, you are a very charitable man, but I will say to you, if it will help you, I think all materials attributed by Agent Stewart to Agent Brown by Source One should be deleted from the April . . . affidavit.
>
> Mr. Groark: All information provided by Source One, Your Honor?
>
> The Court: That's right.
>
> Mr. Groark: You are making a finding that they were all intentionally misrepresented?
>
> The Court: I think they are intentional misrepresentations. Certainly shows a reckless disregard for the truth . . . . .

> \*　　\*　　\*　　\*　　\*　　\*

> Mr. Groark: [T]hen what you're saying is you're making a finding that he made intentional misrepresentations, misrepresentations as to what Source Number One told him about Mr. Lucky's also?
>
> The Court: I believe he did.
>
> Mr. Groark: In the affidavit?
>
> The Court: I believe he did, yes. It's a little bit difficult, a man makes that lengthy kind of an affidavit, to say this paragraph I believe, this I disbelieve. But there was so much of his testimony I found unbelievable, that I have no hesitancy in characterizing it as false. I don't know how I can make it any plainer than that.

> \*　　\*　　\*　.\*　　\*　　\*

> But I can tell you one thing: that if he were still living, J. Edgar Hoover would

be rolling over in his mausoleum if he heard that man in this courtroom.

Tr. 615, 619–20.

The following day, government counsel conceded that no basis for probable cause existed in the April 22, 1977 affidavit in light of the court's ruling. Tr. 626. It was only then that the government argued that only the corporations, and not the individual defendants, had standing to object to the search. Tr. 626–29. Defense counsel immediately challenged the government's position in oral argument. They asserted that standing existed for all defendants under the supervisory power of the federal courts, under "automatic" standing for those charged with crimes for which possession was an element of the offense, and as a result of the legitimate expectations of privacy of the various defendants. Tr. 629–62. No further hearings were conducted, and no specific findings with regard to standing were made. The district court granted the motion to suppress as to all defendants. Tr. 662–63.

## II.

■ One inescapable fact underlies the disposition of this appeal: the search here occurred only because Agent Brown lied to the magistrate. As the district court found, the affidavit lacked probable cause without its false assertions. This search never should have taken place.

The veracity of the assertions supporting probable cause is integral to the criminal justice system. Thus, in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that where the defendant makes a substantial preliminary showing of falsity, "and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. at 2677. It is uncontested that the defendants made that showing here.

In accordance with its constitutional duty, the district court held a hearing. By a preponderance of the evidence the defendants established at that hearing that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Id.* at 155–56, 98 S.Ct. at 2677. The district court further found, as *Franks* requires, that "with the affidavit's false material set to one side, the affidavit's remaining content [was] insufficient to establish probable cause." *Id.* at 156, 98 S.Ct. at 2677. The government has not appealed this finding or the district court's finding of intentional or reckless misrepresentations, which is amply supported by the record. Given the court's finding, *Franks* mandates that:

> the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.*

Brown's misconduct was a manipulation of the judicial process which implements the constitutional requirement that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." *Franks* condemned this type of deliberate or reckless misrepresentation in warrant affidavits. The Supreme Court stated it would be an "unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment." *Id.* at 165, 98 S.Ct. at 2682. "[T]he Warrant clause itself," the *Franks* Court stated, "surely takes the affiant's good faith as its premise." *Id.* at 164, 98 S.Ct. at 2681.

When Brown lied to the magistrate, therefore, he committed two offenses: one against the constitutional guarantee against unreasonable searches, and a second against the judicial system. In addition to the consequences flowing from the lack of probable cause, this second injury to the judiciary itself requires this court to guarantee that none of the tainted evidence reaches the courtroom. Our responsibility to uphold the integrity of the judicial system therefore requires the suppression of all the evidence resulting from the search as to all defendants.

■ The court has inherent authority to regulate the administration of criminal justice among the parties before the bar. *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). Our exercise of the supervisory powers here rests firmly on the Constitution and Supreme Court authority. As the Court stated in *United States v. Payner*, ⸺ U.S. ⸺, ⸺, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980), "[f]ederal courts may use their supervisory power in some circumstances to exclude evidence taken from the defendant by willful disobedience of law." *See, e. g., McNabb v. United States* (supervisory power used to exclude confession taken from defendant after two days of interrogation without being taken before a magistrate, in violation of statute); *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (supervisory power is basis of rule excluding evidence obtained by state officers in search which, if conducted by federal officers, would have violated Fourth Amendment); *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956) (federal court may enjoin federal agent from testifying in state court trial about information obtained during search conducted without probable cause and evidence seized on a warrant based on unsworn statements); *Hampton v. United States*, 425 U.S. 484, 493, 96 S.Ct. 1646, 1651, 48 L.Ed.2d 113 (1976) (Powell, J., concurring in judgment) (supervisory power should be available to bar convictions, when entrapment not available as a defense, because of outrageous police conduct).

Brown willfully disobeyed the law in two ways: he lied in the affidavit, and he lied on the witness stand.[4] The call for the court's supervisory power under these circumstances is at its strongest and most defensible. The judicial system itself has been defrauded. As held in *Franks*, the constitutional requirement of probable cause "would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." *Franks*, 438 U.S. at 168, 98 S.Ct. at 2683. The Court in *Franks* expressly sanctioned the use of the exclusionary rule to remedy this type of fraud on the court, stating that "the alternative sanctions of a perjury prosecution, administrative discipline, contempt, or a civil suit are not likely to fill the gap." *Id.* at 169, 98 S.Ct. at 2684.

Our holding is therefore simple—we will not allow or condone reckless or deliberate misrepresentations made to magistrates. But we note that our holding is not based merely on abhorrence of Agent Brown's conduct, for that would not justify use of our power to suppress the evidence. *United States v. Payner*, ⸺ U.S. at ⸺, 100 S.Ct. at 2444. We recognize that the federal supervisory power does not give "the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). But we do not merely disagree with the method of law enforcement attempted here; rather, we are preventing the court from condoning a fraud perpetrated upon it. To allow this evidence to be used at trial would make the federal courts "accomplices in the willful disobedience of a Constitution they are sworn to uphold." *Elkins v. United States*, 364 U.S. at 223, 80 S.Ct. at 1447. And a judicial system which condones fraud will be of little value to the individuals whose rights it is sworn to protect.

There should be no compromise with the principle that agents of the United States cannot be permitted to manipulate the judi-

---

4. It is always difficult for a written record to convey a witness' demeanor on the witness stand. Indeed, this is the reason that a district court's determination of credibility is almost always binding. But even the cold transcript of Brown's testimony reveals that his answers were evasive, conflicting, and unworthy of be-

lief. We can defer without hesitation to the district court's determination that Brown's testimony was "incredible" and share his assessment that "J. Edgar Hoover would be rolling over in his mausoleum if he heard that man in this courtroom." Tr. 615, 619 ·20.

cial system to circumvent constitutional requirements. The district court was therefore abundantly correct in suppressing the results of the search as to all the defendants.

The recent decision of *United States v. Payner,* —— U.S. ——, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), does not mandate a different result. In fact, upon analysis, the *Payner* decision supports the conclusion we have reached.

In *Payner,* IRS agents broke into a hotel room occupied by a bank executive and stole documents from his locked briefcase. The papers were subsequently introduced into evidence during the trial of defendant Payner. Since the evidence was seized from someone other than the defendant, the Court ruled that Payner could not assert that the search violated any of his personal rights. The Supreme Court reversed the lower court's decision to suppress the evidence under its supervisory powers.

The Supreme Court emphasized that its decision in *Payner* "does not limit the traditional scope of the supervisory power in any way." *Id.* at ——, 100 S.Ct. at 2446. The cornerstone of *Payner* was that the evidence was seized from "a third party not before the court." —— U.S. at ——, 100 S.Ct. at 2446 n. 8. The Court carefully stated that the "illegalities . . . did not infringe the defendant's constitutional rights;" rather, the Court stressed that the

violations that occurred were of a "third party's constitutional rights," and that the party seeking exclusion of the evidence "was not the victim of the challenged practices." *Id.* The Court made its position abundantly clear when it stated, in answer to the dissent, that

> where the illegal conduct did not violate the respondent's rights, the interest in preserving judicial integrity and in deterring such conduct is outweighed by the societal interest in presenting probative evidence to the trier of fact.

*Id.* at ——, 100 S.Ct. at 2447 n. 8. The cases cited by the dissent, the Court stated, did not support a contrary view, "since none of those cases involved criminal defendants who were not themselves the victims of the challenged practices." *Id.*

By the express holding of the *Payner* Court, then, the present case falls within the "traditional scope of the supervisory power." The evidence here was seized directly from "criminal defendants who were . . . themselves the victims of the challenged practices." *Id.*

■ This fact alone should end our inquiry. Nevertheless, the government contends that the defendants cannot properly exclude any of seized materials because none have proven violations of their legitimate expectations of privacy.[5] The *Payner* decision, however, did not hold that defend-

---

5. And the government's simple answer that only the corporations had any privacy interest in their premises is specious. Individuals may have a legitimate expectation of privacy in their offices as well as their homes. *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The relevant issue is whether the defendant had a reasonable expectation of freedom from government intrusion in the area searched or the property seized. *Rakas v. Illinois,* 439 U.S. 128, 140-48, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). The form of the business enterprise does not control the answer. *See Mancusi v. DeForte,* 392 U.S. 364, 368-69, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968); *G. M. Leasing Corp. v. United States,* 429 U.S. 338, 354, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977); *see also United States v. Salvucci,* —— U.S. ——, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

Pamela Bridges testified that the two offices were not public storefronts, but were the central offices of the messenger services. Tr. at 465, 518. We are not convinced therefore that the defendants could not have established, in other circumstances, that they had a legitimate expectation of privacy. The search resulted in the seizure of hundreds of boxes of documents. We do not know which papers were taken from whose desk. After this completely illegal, sweeping search, we think the government has a great deal of temerity to suggest that fourteen defendants must wade through thousands of documents and argue that each one has a "legitimate expectation of privacy" as to each particular document. Indeed, additional support for wielding our supervisory power exists where the government's misconduct prevents defendants from vindicating their constitutional rights under traditional Fourth Amendment procedures.

ants must establish a legitimate expectation of privacy to invoke the supervisory powers if it is proven that the challenged evidence was seized from defendants. By invoking the doctrine of legitimate expectation of privacy under our circumstances, the government would interpret *Payner* to hold that the scope of the supervisory power is identical to that of the Fourth Amendment. But had it so held, *Payner* would have rendered the supervisory power superfluous in cases involving searches and seizures, a result the Supreme Court expressly rejected. The Court stated, "our decision today does not limit the traditional scope of the supervisory power in any way; nor does it render that power 'superfluous,'" as the dissent claimed. 100 S.Ct. at 2447 n. 8. The Court continued, "[w]e merely reject its use as a substitute for established Fourth Amendment doctrine." *Id.* We recognize that the supervisory power is a complement to, not a substitute for, the Fourth Amendment. Application of the supervisory power is limited to situations where there has been a fraud upon the court in addition to a violation of the defendant's rights. We would hope that conduct like Agent Brown's is not so widespread that all violations of the Fourth Amendment are based on a fraud on the court. But when such fraud occurs, it is within "the traditional scope of the supervisory power" to correct it. Because the evidence was seized from the defendants in violation of their own rights, and was seized only by defrauding the court, we must suppress the evidence.

The exclusion of the evidence here is further justified by weighing the competing interests underlying the exclusionary rule. Whether invoked in the name of the Fourth Amendment or the supervisory powers, the interests served by the exclusionary rule are the same. *Payner,* —— U.S. at ——,

100 S.Ct. at 2446. We must weigh "the deterrent values of preventing the incrimination of those whose rights the police have violated," *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969), and the need to protect the integrity of the federal courts against the cost to society of excluding "probative but tainted evidence." *Payner,* —— U.S. at ——, 100 S.Ct. at 2445.

The need for deterrence of illegal conduct is, in one sense, greater here than it was in *Payner,* for Brown's offense was committed within the sanctity of the court itself.[6] The violation here is particularly insidious because it is difficult to uncover misrepresentations in an affidavit underlying a search warrant. The information needed to prove such assertions false is peculiarly within the hands of the government. Agent Brown's misconduct might never have come to light without the good faith of the government attorneys here.

The call to protect our judicial integrity, the second interest to be weighed, is particularly strong here because Brown's misconduct compromised judicial procedures mandated by the Constitution. As pointed out in *Franks,* the magistrate must rely heavily on the assertions made in the affidavit in determining whether to issue a warrant. The magistrate "must determine independently whether there is probable cause." *Franks,* 438 U.S. at 165, 98 S.Ct. at 2681, citing *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 368, 92 L.Ed. 436 (1948). But he "has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations." *Franks,* 438 U.S. at 169, 98 S.Ct. at 2683. Unless officers of the law know that the consequences of deliberate misrepresentations will be the suppression of the evi-

---

6. *See Rea v. United States,* 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956), which is factually very similar to this case. Evidence was seized in *Rea* pursuant to a warrant which lacked probable cause and which was based on unsworn statements. The lawsuit, however, was not for direct suppression, but was to enjoin the federal agent from testifying in state court about the illegally seized evidence. The

court upheld the grant of the injunction, stating "[a] federal agent has violated the federal Rules governing searches and seizures—Rules prescribed by this Court and made effective after submission to the Congress. . . . The power of the federal courts extends to policing those requirements and making certain that they are observed." *Id.* at 217, 76 S.Ct. at 294.

dence, "lawless or reckless misconduct" will not only be encouraged, but invited. *Id.* "The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Id.* at 164, 98 S.Ct. at 2681. Unless we deter behavior such as Brown's, that bulwark will become a Maginot Line, laughingly circumvented by those sworn to respect it. Courts must act in their own self–defense against brazen violations of their procedures. We must draw the line at misconduct occurring within our own house.

Weighed against these two interests is the detrimental effect of excluding the evidence. The Court in *Payner* expressed concern that "unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth–finding functions of judge and jury." —— U.S. at ——, 100 S.Ct. at 2445–46. Here, however, it is that truth–finding function itself which has been corrupted, not because of suppression, but because of the lies told to the magistrate. The truth–finding functions of that magistrate are vindicated, not impeded, by suppression here.

 Finally, invocation of the exclusionary rule here would neither expand its use nor result in the "standardless discretion" criticized by the Court in *Payner. Id.* *Franks v. Delaware* dealt with the first concern. After careful analysis, *see* 438 U.S. 165–171, 98 S.Ct. 2681–2684, the Court expressly approved the use of the rule to exclude evidence seized under a warrant based on a deliberately or recklessly falsified affidavit. The Court said,

> Despite the deep skepticism of Members of this Court as to the wisdom of extending the exclusionary rule to collateral areas . . . the Court has not questioned . . . the continued application of the rule to suppress evidence for the State's case where a Fourth Amendment violation has been substantial and deliberate.

*Id.* at 171, 98 S.Ct. at 2684. And the use of our power is not standardless. Our standard is plain: when the government lies to the magistrate in securing a warrant to the extent that there is no probable cause for the search, and when that search results in the seizure of evidence, this Court will suppress the evidence. Exclusion is based firmly on an exercise of our supervisory power endorsed in *Payner.* A contrary holding would mean that individuals and the court must stand defenseless to offenses committed against their rights and in flagrant violation of procedures designed to protect those rights.

The judgment of the district court is AFFIRMED.