UNITED STATES of America, Plaintiff,

v.

Darrell REDMOND, Defendant.

Nos. CR F 83–99–EDP, CR F 83–147–EDP.

United States District Court, E.D. California.

Feb. 28, 1985.

Roger S. Hanson, Santa Ana, Cal., for defendant.

Ivan Abrams, Asst. U.S. Atty., for plaintiff.

ORDER ON DEFENDANT'S MOTION TO SUPPRESS.

PRICE, District Judge.

*Procedural History*

On June 7, 1983, a search warrant was issued for the search of the "Darrell Redmond residence," 1273 Washington Avenue, Oildale, California. On June 9, 1983, this warrant was executed at the above-described residence, and over 96 firearms were seized at that site by agents of the Bureau of Alcohol, Tobacco and Firearms. Based on that search, the defendants Darrell and Monica Redmond were indicted for violations of 26 U.S.C. § 5861(d), (Possession of an Unregistered Firearm); and 18 U.S.C.App. 1202(a)(1), (Felon in Possession of Firearms). This indictment is the subject of case No. CR F 83–99–EDP.

On August 9, 1983, another affidavit was sworn before the Magistrate seeking a search warrant at the same residence. The second search resulted in the seizure of two guns, receipts and photographs. The search resulted in a second indictment against the defendant Darrell Redmond, charging him with two violations of 18 U.S.C.App. 1202(a)(1), (Felon in Possession of Firearms). This indictment forms the basis of Action No. CR F 83–147–EDP.

A third search warrant was issued on April 10, 1984, and was executed on April 12, 1984. The objects seized in this search formed the basis of a third indictment being returned against defendant Darrell Redmond, charging him again with a violation of 18 U.S.C.App. 1202(a)(1), (Felon in Possession of a Firearm). This indictment forms the basis of Action No. CR F–84–67–EDP. This motion does not involve that action.

In Action Nos. CR F 83–99–EDP and CR F 83–147–EDP, the defendant Darrell Redmond was represented by attorney James Oliver. His wife, the defendant Monica Redmond, was represented by attorney Larry Lee. On March 12, 1984, then counsel for the defendant Darrell Redmond filed a motion to suppress the evidence

which was seized by virtue of the execution of the search warrants issued on June 7, 1983 and August 9, 1983. In his moving papers, Mr. Oliver indicated that the basis for the motion was as follows:

1. The affidavits in support of both warrants failed to state sufficient particularized nonconclusionary facts to constitute probable cause for the issuance of a warrant for the search of the residence at 1237 Washington Avenue, Oildale, California;[1] and

2. The warrant executed on August 9, 1983, was the product or fruit of the illegal search and seizure of June 7, 1983.

After the hearing in the matter at which no evidence was introduced, the Court filed its written order on April 25, 1984, denying the motions to suppress. Reference is made to that order for further particulars.

As the trial date approached, the defendant Darrell Redmond discharged his then attorney, Oliver, and hired new counsel. The government dismissed all counts against his wife, the defendant Monica Redmond.[2] In Action No. CR F 84–67–EDP, by agreement between the government and the appointed counsel for the defendant Darrell Redmond and the Court, all proceedings have been stayed pending the outcome of the new motions filed in Action Nos. CR F 83–99–EDP and CR F 83–147–EDP.

After retention of new counsel, a second motion to suppress the evidence was filed on October 10, 1984. Present counsel for the defendant describes the scope of motion as follows:

This renewed motion goes beyond that motion previously filed, for that motion

improperly and deficiently failed to attack the veracity of the search warrant affidavit within the provisions of *Franks v. Delaware*, 48 [438] U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667].

The previous motion, together with authorities, is incorporated and renewed as far as it goes.

A full evidentiary hearing under the provisions of *Franks v. Delaware, supra*, is contemplated on November 13, 1984, as it is averred that defendant has met his burden for the hearing provided by *Franks*.

An evidentiary hearing was had in the matter on November 13, 1984.

ATF Special Agent Urrea (hereinafter "Urrea") originally testified on direct examination that when he submitted the affidavit for the June 7, 1983, search warrant to Magistrate Christensen, he was relying on certain computer printouts which he received from the appropriate agency of the State of California. These computer printouts were obtained in June of 1983, shortly before the first search warrant was issued and executed. They listed firearms transactions engaged in by both Monica and Darrell Redmond. (*See* Reporter's Transcript, pages 6 and 7.)

The most remarkable part of Urrea's testimony is as follows:

On the computer printouts he noticed that there were several entries which were described by the word "Pawn." Urrea believed that the word "pawn" meant that a person who had previously pledged an item was redeeming it, and hence he mistakenly believed that Redmond, on the operative date[3] contained in the entry, was coming

---

1. Redmond's first motion to suppress, brought by Oliver, attacked the adequacy and timeliness of the information upon which Urrea relied to establish that the targeted premises were in fact the residence of this defendant. The Court ruled adversely to the defendant on that ground. Though raised again by current counsel, the Court addresses only the new matters raised by the new motion.

2. Apparently a bargain was struck between the U.S. Attorney's office and counsel for the Redmonds that the charges against Mrs. Redmond

in Action No. CR F 83–99–EDP would be dismissed if Darrell Redmond entered guilty pleas to some of the charges pending against him. After considering a pre-plea probation report, Darrell decided not to change his plea. The government proceeded to move for dismissal as to Mrs. Redmond. Their motion was granted.

3. All of the transactions relied upon by Urrea to seek the search warrant occurred more than a year before he sought the search warrant.

into the possession of the described firearms.[4] In fact, Redmond was surrendering possession of the firearms on these operative dates.

Indeed, the operative paragraph of the June 7th affidavit reads as follows:

7. On June 3, 1983, I contacted the State of California, Department of Justice, Automated Firearms System Section, Sacramento, California, and requested a records check of Darrell Ray REDMOND. Their records indicated that REDMOND owns the following firearms:

a. LC Smith double barrel shotgun, 12ga., serial number 166174.

b. Winchester shotgun, 12ga., serial number L11103439A.

c. Smith and Wesson revolver, .38 cal., serial number 8668.

d. Smith and Wesson revolver, .38 cal., serial number 58459.

e. Walther PPK pistol, 9mm., serial number 15255.

f. Browning High Power pistol, 9mm., serial number 245PM26787.

g. Colt revolver, .32 cal., serial number 271336.

h. H & R revolver, .22 cal., serial number 577512.

i. RIA Richards shotgun, 12ga., serial number 20738.

AFS records further indicated that REDMOND purchased items a. and i. on February 11, 1982, from Globe Jewelry and Loan, 1124 19th Street, Bakersfield, California, while under information for a felony in Kern County, Bakersfield, California, Superior Court No. 22802.

It should be noted that the affidavit affirmatively represents that the source of Urrea's information on this point is the Automated Firearms System Section of the Department of Justice, State of California, who supposedly supplied Urrea with this information on June 3, 1983. Despite the affirmative statement contained above, there is no basis contained in the AFS printouts introduced into evidence from which it could be inferred that Darrell Redmond possessed any of the guns after his state conviction.

Government's Exhibit 1, however, is a printout of that transmission, and identified as the document upon which Urrea relied. It reveals that the weapons described in subparagraph a, subparagraph b, subparagraph c, subparagraph f, subparagraph i, were voluntarily pawned by Redmond at various dates between February, 1981, and February 1982.

An AFS printout which was introduced into evidence by defendant's counsel reveals the following:

That the gun described in subparagraph e, of paragraph 7, was pawned by Monica Redmond on March 23, 1983.

That the gun described in subparagraph g, of paragraph 7, was pawned by Monica Redmond on November 26, 1981.

That the gun described in subparagraph f, of paragraph 7, was pawned by Monica Redmond on January 14, 1983.

On cross-examination, however, Urrea admitted that he must have used the Monica Redmond printout to describe the guns listed in subparagraphs e, f and g of paragraph 7.[5]

Of course, the case has been dismissed against Monica, the government presumably conceding that she did not violate the law by possession of any firearm.

---

**4.** The Court is informed that all government offices are furnished, upon request, a one-volume dictionary, to wit, Webster's New Collegiate Dictionary. That work describes "pawn" as follows:

"pawn/*n* ... 1 a: something delivered to or deposited with another as security for a loan. b: Hostage. 2: the state of being pledged. 3: something used as a pledge: Guaranty 4: the act of pawning."

"pawn/*vt:* to deposit in pledge or as security —"

**5.** This fact was not contained in the affidavit submitted to the Magistrate. The June 7th affidavit does not contain any allegations concerning Monica's relationship to Darrell, or whether she was a resident at the premises sought to be searched. Urrea never did explain why he sought a printout on Monica.

Another troubling facet of this case is that Redmond was not convicted of the felony upon which the search was predicated until February 17, 1982.

Even if Urrea's skewed understanding of the English language were correct, the printout upon which he alleges he relied to obtain this search warrant clearly shows that *all* of the transactions occurred *before* Redmond was convicted of a felony. While the affidavit does reveal that utility workers and public works employees observed guns on the premises in August of 1982 and March of 1983, the only allegations to tie them to this moving defendant had its source in the AFS printout discussed above.[6]

The dismissal of the charges lodged against Redmond's wife, Monica, raises the inference that possession by her of the weapons described in the indictment is not illegal. The Court knows of no general or specific federal (or state) criminal statute, nor did either counsel cite such, making the possession of a weapon by the spouse of a convicted felon a criminal act.

After a Court recess, it was revealed that there were in fact *two*. AFS printouts—one dated June 2, 1983, a copy of which was represented to the Court as being the source of Urrea's information for the preparation of the June 7th affidavit. A copy of this document was attached to the government's original response to defendant's motion. After the recess it was again represented to the Court that Government's Exhibit 1 was the AFS printout that Urrea used to prepare the June 7th affidavit. As counsel for the defendant correctly points out, the guns described in subparagraphs 7(d), 7(e) and 7(g) are nowhere listed on that printout.

Urrea then proceeded to impeach the government's position by testifying that the information about the weapon de-scribed in subparagraph 7(d) came from oral communications with the state agency. Urrea then explained that the document which contained the information about the weapon described in subparagraph 7(d) was orally transmitted to him from Sacramento, and that he had no printout until one week after June 2, 1983, or about June 9, 1983, after the affidavit was prepared. The fact that Urrea did not have the actual copy of the AFS printout, and that he was working from hearsay communications, was never revealed to the Magistrate.

Despite their attempt to rehabilitate Urrea as a credible witness, Urrea never did explain where he got the information that formed the basis for subparagraphs 7(e) and 7(g), the guns attributed to Monica. The only evidence before the Court was that to the effect that the dismissed co-defendant had pawned these weapons. The Court has read and re-read the Reporter's Transcript and can only conclude that the guns must have been orally described to Urrea by the state agency.

In addition, Urrea showed remarkable lack of knowledge with reference to the regulations applicable to firearms transactions by pawnbrokers. The defendant produced a witness, an experienced pawnbroker, who indicated that when a pawnbroker accepts a property as security for a pawn loan, he is required to issue a report that is immediately turned over to the police department who, in turn, sends it to Sacramento for registration. This document must be filled out with regard to all property being pledged with the pawnbroker, not only guns. Presumably, however, only the information concerning guns is forwarded to Sacramento where it goes into the computer of the appropriate state agency. That explains why Urrea was able to pick up these transactions with the guns that were pawned by Darrell and Monica Redmond. It also explains why Urrea's vocab-

---

**6.** The affidavit is replete with references to "the Redmond residence." It is devoid, however, of facts that reveal the evidentiary process by which Urrea concluded that 1237 Washington Avenue, Oildale, was the residence of Darrell Redmond.

Neither counsel addressed the issue as to whether the presence of a felon in a residence shared with others who are free from taint, plus the presence of weapons, establishes sufficient probable cause to issue a search warrant.

ulary deficiency and his lack of knowledge concerning California pawn regulations produced the bizarre results now confronting the Court.

On the other hand, if the person who owned the gun reclaims it, the pawnbroker does not furnish the police with any information, but merely fills out a form that is prescribed by the Bureau of Alcohol, Tobacco and Firearms. These forms are required to be kept on hand, and occasionally someone will come by to check to see if they are in proper order. Normally, law enforcement does not concern itself with these forms unless they are investigating a specific case. Apparently, at some time after the search warrants were issued, Urrea did visit the pawnshop in question and did take copies of all the forms referring to the Redmonds.

On the other hand, if a third person who *did not pawn* the weapon purchases it from a pawnbroker, the pawnbroker must comply with all of the requirements that apply to the sale of a hand gun.

The Court raises this matter, not to be critical of the involved agency for their training of their field agents, but rather because it would appear to bear directly upon whether, in the words of *Franks v. Delaware*, the allegations contained in the affidavit under attack were made in "reckless disregard for the truth."

### Order For Further Briefing

At the conclusion of the evidentiary hearing, the Court directed counsel for the government to brief two issues:

1. The effect of Redmond's counsel not raising the issues tendered by the second motion in the original motion to suppress, and

2. The applicability of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to the facts established at the evidentiary hearing.

The Court received the final briefing as ordered on December 17, 1984, at which time the matter stood submitted.

### The Effect of the Prior Motion and The Court's Adverse Ruling Thereon

In their original response to the defendant's renewed motion, the Government did argue that certain matters relied upon by defendant in the second motion had been previously litigated adversely to the defendant. The Assistant U.S. Attorney representing the government in this case did note in part: "Finally, I accede to the defendant's request for a hearing based upon the teachings of *Franks v. Delaware*, 438 U.S. 154 [98 S.Ct. 2674, 57 L.Ed.2d 667] ...."

In their supplemental briefing ordered by the Court, the Government conceded that since they had concurred from the outset that Redmond was entitled to an evidentiary hearing pursuant to *Franks*, that the preclusive effect of the prior ruling was now moot. Accordingly, the Court will not consider it further.

### The Applicability of the Rule Stated In Franks v. Delaware To the Instant Case

At the outset, it should be noted that *Franks v. Delaware, supra,* outlines the procedure to be followed where the defendant raises a substantial question as to the truthfulness of the statements contained in the affidavit relied upon by the Magistrate to issue the search warrant. That procedural morass, was, as the Government concedes, mooted when the Government conceded the plaintiff had made the threshhold showing to afford him the right to have an evidentiary hearing. The Court now must wrestle with what happens after the evidentiary hearing produces overwhelming proof that the statements contained in the affidavit upon which the search warrant was issued were not intentionally falsified, but rather, were based upon erroneous assumptions as to the meaning of certain words contained in the information upon which the affidavit is based; and further, where the documentary evidence does not bear out that the statements were the result of a simple mistake.

The Court's request for additional briefing on the *Franks* issue brought an interesting and frankly puzzling reply from the Government. The Government's reply brief, in pertinent part, states the following:

The information received from the various county inspectors and utility company workers was not fresh, and the government concedes that it was stale. According to *United States v. Mc-Donald*, 723 F.2d 1288 (7th Cir.1983), cert. den., [466 U.S. 977], 104 S.Ct. 2360 [80 L.Ed.2d 831] (1984), if probable cause cannot be established from the valid and truthful position of an affidavit which remains after the excision of portions found to be in *Franks*, then the entire warrant must be deemed to be invalid. Any ensuing search would, of course, thus be invalidated as well. However, the government suggests that such a Draconian measure need not be employed, even if the court finds that paragraph 9 of the affidavit must be removed. First, the government suggests, the court must decide whether *Leon, supra*, ought to be applied retroactively. The government's position is that Leon is retroactive. In *United States v. Estrada*, 733 F.2d 683, 864–695 (9th Cir.1984), the court held that *Illinois v. Gates*, 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527] (1983) was retroactive. There is no reason to distinguish the retroactivity of *Leon* from that analysis of retroactivity as discussed in *Estrada, supra*. As a rule, judicial decisions apply retroactively. *Solem v. Stumes*, [465] U.S. [638], 104 S.Ct. 1338 [79 L.Ed.2d 579] (1984).[7]

After making this concession, the Government concedes that:

If the court finds the warrant is insufficient, then, the government suggests, it should consider the *Leon* good faith exception, even where the warrant is insufficient due to a *Franks* violation. The *Franks* violation, if any, in the instant case would apply only to paragraph 9 of the affidavit.

Unfortunately, the government misreads *United States v. Leon*. The majority opinion in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), made it quite clear that it was not the intention of the Court in the *Leon* decision to disturb the thrust of *Franks:*

Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. *Harlow v. Fitzgerald*, 457 U.S. 800, 815–819, 73 L.Ed.2d 396, 102 S.Ct. 2727 [2736–2739] (1982), and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154, 57 L.Ed.2d 667, 98 S.Ct. 2674 (1978).

*United States v. Leon, supra*, 922–923, 104 S.Ct. at 3421–3422, 82 L.Ed.2d at 698–699.

Research by defendant's counsel was more helpful in that it found the "reckless disregard" issue. Counsel cites *United*

---

**7.** Paragraph 9 of the affidavit presented to the Magistrate for the issuance of the June 7, 1983, search warrant, reads as follows:

9. That as a result of my training and experience, I know that persons who receive and possess firearms, usually store them in their residence or vehicles, along with other items of personal property, and that persons who receive and possess firearms also possess and store ammunition, receipts, warranty cards, the original manufacturers' containers, spare parts and accessories for those firearms, and photographs of said firearms or themselves in possession of said firearms, in their residence along with other items of personal property. The observations of Dirksen, Mawson and Heyart of numerous firearms at the REDMOND residence as set forth above, are consistent with your affiant's opinion as to the method of possession, based upon my training and experience.

*States v. Davis,* 714 F.2d 896 (9th Cir.1983), in support of his position. In *Davis,* as here, two search warrants had been issued as a result of an ongoing criminal investigation. For clarity of understanding, they will be referred to as the PDI search warrant and the Blue Lagoon search warrant. The affiant for the PDI search warrant was Officer Epstein. Officer Epstein's affidavit relied largely on information supplied by confidential informants. On the first appeal [*United States v. Davis,* 663 F.2d 824 (9th Cir.1981)], the Ninth Circuit, using the two-prong test established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), determined that the affidavit for the PDI search warrant contained sufficient indicia of reliability of the informants to justify the magistrate's conclusion that probable cause existed for the issuance of the search warrant. However, in that same opinion, the court concluded that the Blue Lagoon warrant was deficient, and remanded the matter to the district court for further hearing. At the subsequent hearing, it was determined that:

> Thompson admitted that much of the Blue Lagoon affidavit had been copied verbatim from the PDI affidavit. The PDI affidavit stated that the affiant had acquired much of the information contained therein through personal interviews with various informants. Officer Epstein, the affiant in the PDI warrant, was not available when the Blue Lagoon affidavit was prepared. Rather than wait for him to return Thompson signed the Blue Lagoon affidavit. "Unfortunately, the affidavit was not changed to state 'Officer Epstein was told' but remained in the first person singular. Thus, Thompson did not, as he swore in the affidavit, communicate directly with any of the listed informants." 663 F.2d at 829–30.

*United States v. Davis,* 714 F.2d at 897–98.

*Davis* cannot easily be distinguished from the instant case in a material matter.

The officer affiant in Davis knowingly misrepresented to the magistrate in his affidavit that he had personal knowledge. The court implicitly held that had he related the source of his information that the question would have been much closer.

Here, the major portion of Urrea's misfeasance arose from a claimed combination of language deficiency and lack of knowledge of state pawnbroker regulations, rather than from a deliberate falsehood. However, the fact remains that as to at least two guns described in the affidavit, the source of Urrea's information was never revealed to the Magistrate. In reviewing Urrea's testimony, the Court cannot determine the source of that information. Further, Urrea's later testimony indicated that he actually relied on information given to him by telephone.[8]

However, the defendant's use of *Davis I* and *Davis II* as the basis for his attack was never answered by the government.

Counsel for the defendant also cites *United States v. Spetz,* 721 F.2d 1457 (9th Cir.1983). In *Spetz,* the search warrant was obtained upon information revealed by the use of detector dogs. The dogs were named Randy and Humphrey. In the affidavit presented to the magistrate for the search warrant, Humphrey was described as having a previous correct alert record of 60 out of 66, and Randy had been correct in 2 out of 2. In fact, it was later proven that the records of both dogs were misstated in the affidavit. Humphrey's prior record was 56 correct alerts in 61 attempts, and Randy's record was only 2 correct alerts in 6 attempts.

First the Court found that the mistake in the affidavit as to Humphrey's record was unimportant because the difference was minimal, and that further, Humphrey's alert had been corroborated by Randy. Finally, the court found that the record contained no suggestion that the misstatements in the records of Humphrey and Randy were deliberate or in reckless dis-

---

**8.** This raises another possibility of error by Urrea. The state employee may have misread the computer printout or Urrea may have recorded the information erroneously.

regard of the truth. The appellate court determined that a *Franks v. Delaware* violation had not occurred. The rationale of this opinion deems that if the false information is corroborated by other means or data, its falsity is mooted.

Most of the appellate cases since *Franks* was decided deal with the preliminary procedural showing that the defendant must make to be entitled to an evidentiary hearing. As noted above, that is mooted here by the government concession.

A few other cases, however, have dealt with the type of false information that must be shown before the defendant is entitled to have the evidence suppressed found by the courts own research. One such case is *United States v. Cortina,* 630 F.2d 1207 (7th Cir.1980). In *Cortina* the government delivered the Jencks Act material to defendant's counsel for trial preparation. Upon inspecting the material, the defendant's counsel immediately realized that the search warrant which formed the basis for the prosecution was obtained on the basis of false statements contained in the affidavit. That case can best be summarized by the following quotation from the appellate opinion: "One inescapable fact underlies the disposition of this appeal: the search here occurred only because Agent Brown lied to the magistrate. As the district court found, the affidavit lacked probable cause without its false assertions. This search never should have taken place." (*United States v. Cortina, supra,* at 1213.)

In *United States v. Smith,* 588 F.2d 737 (9th Cir.1978), the affidavit for the search warrant contained three admitted inaccuracies which the circuit court found arose because of "erroneous assumptions on the basis of information he received; but this does not amount to the reckless inclusion of false statements in his affidavit." The applicable rule, the Court stated, is that:

Omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause. *Ac-*

*cord, United States v. Astroff,* 578 F.2d 133 (5th Cir.1978); *United States v. Barone,* 584 F.2d 118 (6th Cir.1978).

*United States v. Smith, supra,* at 739, 740.

Carried to its logical conclusion, the *Smith* test turns on the state of mind of the affiant. Under such a test "reckless disregard" becomes almost the equivalent of an intentional falsehood, whereas, in civil law it refers to communications undertaken by an actor who, in light of the surrounding facts and circumstances, must have entertained doubts as to its truth. All the cases agree that more must be shown in a violation of the "reasonable man" rule.

In the excellent review of this problem in 2 *Search and Seizure,* Le Fave, § 4.1, the author concludes that:

*Franks* distinguishes between the negligent misrepresentation on the one hand, and the recklessly made or false misrepresentation on the other. Franks does this, he believes, because total suppression of the evidence is too harsh a penalty to impose for mere negligence. An illustration of this distinction is found in *United States v. Bulgatz,* 693 F.2d 728 (8th Cir.1982), *cert. den.* 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 444. Although *Bulgatz* turned on the preliminary showing required in *Franks,* the Court did make the following statement which bears perpherially on the problem with which this Court is now dealing:

However, appellants offered no proof of recklessness or deliberateness in connection with that misstatement. Rather, they only pointed out to the district court why they believed that the misstatement was material. They argued that if Elizabeth had actually met Ramirez in the seclusion of her car, then it is logical to assume that Ramirez gave her the drugs rather than that Elizabeth got the drugs from her house. Because appellants failed to offer proof that the misstatement was reckless or deliberate, they failed to meet the first condition required for a hearing. Hence, we find that the

district court was correct in denying appellant's motion for a rehearing.

*United States v. Bulgatz, supra,* at p. 732.

The Court specifically finds that the allegations contained in paragraph 7 of the affidavit of June 7, 1983, paragraph 11 of the affidavit of June 7, 1983, were made with a reckless disregard for truth or falsity of their content. The Court reaches this conclusion because the attempted explanation by Urrea as to what he did is filled with contradictions, and is not supported by the documentary evidence upon which he originally claimed he relied at the evidentiary hearing. This, in turn, reflects upon his credibility as a witness, both at the time he prepared and swore to the affidavit and at the time he testified in court. Because of his conduct, the Magistrate was not able to perform his statutory duties as neutral and detached judicial officer in determining probable cause.

Further, Urrea was not confronted with an emergency here. These guns were first sighted in these premises in August, 1982, and again in March, 1983. Finally, Urrea, aware of his lack of knowledge of state pawnbroker procedures, had a duty to make inquiry as to their nature and requirements.[9]

Without the support of the allegations of paragraphs 7 and 11, the affidavit of June 7, 1983, does not demonstrate probable cause for the issuance of a search warrant.

The affidavit of August 9th which form the basis for the issuance of the search warrant bearing the same date relies entirely on information obtained and items seized in the search conducted pursuant to the June 7, 1983, search warrant.

Since the search of June 7, 1983, and August 9, 1983, were not conducted pursuant to a validly issued search warrant, the evidence seized pursuant to that search warrant must be suppressed and will not be admissible in evidence against the defendant Redmond.

IT IS SO ORDERED.

9. There is evidence that Urrea did visit the pawnbroker involved in the transactions with Darrell *after* the June and August searches oc-

curred. It was on this visit in September of 1983, that Urrea learned of his misinterpretation of the verb "pawn."