UNITED STATES of America, Plaintiff,

v.

Roy L. WILLIAMS, Joseph Lombardo, Thomas F. O'Malley, and Andrew G. Massa, also known as Amos Massa, Defendants.

No. 81 CR 269.

United States District Court,
N.D. Illinois, E.D.

June 17, 1983.

Douglas P. Roller, Gary Shapiro, Mark Vogel, U.S. Dept. of Justice, Chicago, Ill., for plaintiff.

Thomas A. Wadden, Jr., William F. Krebs, Wadden, Scherr, Krebs & Gitner, Washington, D.C., for defendant Williams.

George J. Cotsirilos, Robert M. Stephenson, Cotsirilos & Crowley, Ltd., Chicago, Ill., for defendant Massa.

William Hundley, Lawrence Gondelman, Hundley & Cacheris, P.C., Washington, D.C., for defendant O'Malley.

Frank W. Oliver, Northfield, Ill., Judith Halprin, Halprin, Halprin & Cantor, Chicago, Ill., for defendant Lombardo.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

■ On December 15, 1982, a jury found defendants Roy L. Williams, Joseph Lombardo, Thomas F. O'Malley and Andrew G. Massa guilty of conspiracy to bribe a United States Senator, travel in interstate commerce with intent to commit bribery, and nine counts of wire fraud, in violation of 18 U.S.C. §§ 201(b)(1), 371, 1343 and 1952 (1976).[1] Defendants filed multiple individual motions for a new trial, in arrest of judgment and for a judgment of acquittal under Fed.R.Crim.P. 29(c), 33 and 34. All of the motions were denied on January 26, 1983 save one in which all defendants sought a new trial because of alleged post verdict contact between a juror and a witness. That motion was denied on March 31, 1983. A four week sentencing hearing ensued, and, on March 31, 1983, defendants were sentenced to various periods of incarceration. Thereafter, all defendants filed timely notices of appeal to the United States Court of Appeals for the Seventh Circuit.

■ On April 13, defendants O'Malley and Massa filed their third motion for new trial under Fed.R.Crim.P. 33[2] which has been joined by all defendants. The motion is based on what defendants characterize as newly discovered evidence. The parties have briefed the question of whether the "evidence" that has been submitted in support of the motion warrants a new trial.[3]

---

1. Allen M. Dorfman was also convicted on these charges. He was murdered on January 20, 1983 and the indictment was dismissed as moot as to him.

2. The court on motion of a defendant may grant a new trial to him if required in the interest of justice.... A motion for new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for new trial on any other grounds shall be made within 7 days after verdict of finding of guilty or within such further time as the court may fix within the 7–day period. Fed.R.Crim.P. 33.

3. Though there is an appeal pending in this case, we have jurisdiction to either deny the motion on its merits or certify our intention to grant it to the court of appeals, which could then entertain a motion to remand the case. *United States v. Ellison,* 557 F.2d 128, 132 (7th Cir.), *cert. denied,* 434 U.S. 965, 98 S.Ct. 504, 54 L.Ed.2d 450 (1977).

## I

Defendants' "newly discovered evidence" consists of the affidavit of H. Edward Tickel ("Tickel"), which we take as true for present purposes.[4] In 1978 and 1979 Tickel was a Special Agent of the Federal Bureau of Investigation ("FBI") stationed in Washington, D.C. In October 1979, while he was in Chicago on other FBI business, he was told by other FBI agents that he might be asked to assist in breaking into a large office building in order to place microphones in several offices as part of electronic surveillance in an ongoing investigation. It later developed that the building was located at 8550 W. Bryn Mawr Avenue, in Chicago, which housed, inter alia, the offices of Allen Dorfman's Amalgamated Insurance Company, the Central States Pension Fund and the International Brotherhood of Teamsters.

When Tickel next returned to Chicago, he learned that the agents had acquired a magnetic card which enabled them to enter the building from the basement parking area and had obtained permission to use an office on the fourth floor of the building, belonging to the Milk Producers Association. During this period, Tickel and other agents used the card to enter the building and go up to the fourth floor office on several occasions. Tickel also used the locks in the Milk Producers' office to make a master key for the entire building.

After testing his key on other locks in the building, Tickel and one or two other FBI agents went down to the second floor offices of their target, Amalgamated Insurance Company, where they used the key to enter the reception area by a door that led from the common stairwell. Tickel observed the security camera and locks on Amalgamated's doors, determined that he could make a key that would open the doors, and left.

In order to study Amalgamated's security system further, Tickel soon returned to Amalgamated, accompanied by another agent, on a pretext interview. While pretending to be interested in an insurance claim, Tickel observed the office.

During either December or January, Tickel returned to Chicago and was told that another entry into Amalgamated's offices would be required to learn more about its security systems. FBI agents had been watching Amalgamated's offices from the building's parking lot, and had learned that every day the cleaning persons would leave the doors to the stairs open and part of the suite unattended.[5] Therefore, Tickel took advantage of this opportunity to enter the offices, while in communication with agents in the parking lot who watched to see if any cleaning persons might return and catch Tickel. Tickel used his master key to enter the alarm room, and studied the alarm system to learn if there were any back-up systems in addition to the main system, and to learn details regarding the main system.

Tickel then left the alarm room and went to the telephone frame room, which he entered with his master key. He checked this room for back up alarm equipment. After finishing in the frame room, Tickel left the building.

Tickel told the FBI's alarm expert what he learned during this entry, and from his conversations with the expert Tickel concluded that this information enabled the expert to understand and hence to defeat Amalgamated's alarm system. Tickel also learned that the other agents had learned the location of the telephone line that connected Amalgamated's alarms with its alarm company's monitoring system by

---

4. We consider the affidavits the government has filed in opposition to the motion only to the extent they are not controverted by the Tickel affidavit. We have resolved all issues of credibility in favor of Tickel.

5. Tickel also alleges that agents surveilled Amalgamated from the space near the second floor stairwell. However, no allegation is made that this surveillance was necessary to learn what the FBI did learn about the cleaning persons. Since surveillance of the cleaning persons during Tickel's surreptitious entry was done solely from the parking lot, it appears the surveillance from the stairwell was superfluous and did not assist the FBI in obtaining any evidence.

talking to the telephone company, and had rented room space and telephone lines near this line in order to monitor the line and eventually defeat it.

On April 7, 1979, then Chief Judge James B. Parsons granted the government's request that the FBI be authorized to enter surreptitiously Amalgamated's offices and place microphones in the private offices of Allen Dorfman and William Webbe. Tickel returned to Chicago on April 11 and assisted other agents in placing these "bugs."

Some months later, Tickel returned to Chicago, on November 7, 1979, to assist the FBI in making a "technical survey" of a suite of hotel rooms at the Sheraton-O'Hare in Chicago which the FBI anticipated would soon be the subject of a court order authorizing electronic surveillance. The next day, Tickel purchased some key blanks, then went to the suite when no one was there and made a key for the door. He did not enter the suite on that occasion, but did return on November 9 and entered the suite with his key to reconnoiter it. Subsequently the Department of Justice refused to approve the surveillance, and the surveillance equipment was never placed in the suite.[6]

Defendants claim that this evidence, if true, would establish that the electronic surveillance in this case was tainted by government misconduct, and, as a result, the fruits of this surveillance should not have been admitted into evidence at trial.

## II

The parties agree that the standards for a rule 33 motion are demanding.

> The defendant[s] must show that the evidence (1) came to their knowledge only after trial; (2) could not have been discovered earlier had defendants exercised due diligence; (3) is material, and not merely impeaching or cumulative; and

(4) would probably lead to an acquittal in the event of a retrial. As recognized in *United States v. Curran,* 465 F.2d 260, 262 (7th Cir.1972), these standards reflect the fact that such motions "are not favored by the courts and are viewed with great caution."

*United States v. Oliver,* 683 F.2d 224, 228 (7th Cir.1982).

The first two elements go to the question of whether it is appropriate for defendants to raise the new evidence at this time. We doubt that either element is satisfied in this case.

■ First, defendants must show that the evidence came to their knowledge only "after trial." The motion was not filed until April 13, 1983, two weeks after defendants were sentenced. Yet they had learned of Tickel's allegations approximately three months earlier, *see* Motion of Defendants O'Malley and Massa for a New Trial ¶ 3, shortly after the verdict was returned. Thus, it appears that defendants could have raised this issue in their initial post-trial motions which were not due to be filed until January 11, 1983 and certainly prior to or during the sentencing hearing (which ran intermittently from February 7 through March 31). But they did not.

While it is unclear whether the pendency of the post-trial proceedings should provoke the conclusion that defendants did not learn of the evidence "after trial" and hence cannot raise the issue under rule 33, at a minimum we think we should express our displeasure at defendants' failure to raise the issue—which was known to them—until after sentencing. We may have discretion to deny the motion on this basis alone. We choose not to do so. But we observe that multiple and belated motions for new trial are looked upon with disfavor because they are not in the interests of the orderly administration of justice.[7]

---

**6.** In November 1980 the FBI again requested approval to place electronic surveillance equipment in the suite and that Tickel be dispatched to assist in the placement. This request was denied and Tickel never went out to Chicago.

**7.** This is the 199th written motion presented by the parties in the course of this litigation. Each has received individual attention and a ruling (oral or written) stating the reasons therefor.

We also question defendants' assertion that they could not have discovered this evidence earlier had they exercised due diligence. At no point during the weeks of extensive pretrial proceedings concerning the legality of the electronic surveillance in this case nor during the trial when the parties, court and jury were concerned with the audibility and credibility of the recordings of the intercepted conversations, did defendants seek to inquire as to how and where the surveillance equipment was placed in Mr. Dorfman and Mr. Webbe's offices. Had defendants sought such information, we might well have permitted them extensive discovery on the question, which might have disclosed Tickel's name and enabled defendants to contact him.[8] Defendants—all of whom worked in or frequently visited the building—were undoubtedly aware of the extensive security arrangements at Amalgamated and hence would have reason to inquire whether the government could have defeated them without taking improper steps.[9]

Defendants' present argument that they had no reason to question the government's good faith or adherence to law is disingenuous at best. At every step of the way in this case defendants have attacked the government's good faith and adherence to the law. Defendants sought and obtained extensive discovery because they refused to accept the government's assertions prior to the suppression hearing that it had complied with the law. Their failure to explore the placement of the microphones prior to now is not the product of due diligence.

While defendants have failed to demonstrate the first two elements required for a new trial under rule 33 and *Oliver,* we nevertheless will consider and decide the remaining issues presented by the motion, both to provide the court of appeals with a complete record for its review and hence obviate the necessity for a remand should it decide that the motion was properly presented, and because defendants' allegations of governmental misconduct raise important issues in the administration of justice that should be addressed. *See generally United States v. Turner,* 490 F.Supp. 583, 609 (E.D.Mich.1979), *aff'd mem.,* 633 F.2d 219 (6th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981).

The Tickel affidavit certainly does not contain merely cumulative or impeaching evidence. The allegations are entirely new to the case and raise a ground for suppressing evidence which we have not previously considered. The final question under rule 33 is whether this evidence would probably lead to the acquittal of defendants. If defendants are correct that the new evidence requires the suppression of all fruits of the microphone surveillance after April 7, and all surveillance, both telephonic and oral, that resulted from applications filed after April 7, then evidence critical to the government's case would have been excluded and defendants might well have been acquitted. Furthermore, defendants urge that the Tickel allegations reflect so adversely upon the government's good faith in initiating the electronic surveillance in this case that we should reconsider our entire ruling on the motion to suppress and exclude all of the surveillance evidence. Accordingly, we must decide whether defendants are correct that the Tickel allegations warrant the sup-

---

**8.** In fact, the discovery we did permit defendants on other issues revealed Tickel's name and involvement in the placement of bugs. Williams' suggestion in his reply memorandum that we limited discovery is incorrect. While we did limit discovery as to wiretaps that did not produce evidence to be offered at trial, and as to the government's confidential informers, we in no way limited defendants' discovery of the details of the surveillance that did produce the evidence offered against them. Moreover, at the suppression hearing and before trial we did eventually order disclosure involving confi-

dential informants and other electronic surveillance.

**9.** Moreover, the pre-discovery motion to suppress discovery which defendants did receive revealed that the microphones were placed in Dorfman's and Webbe's offices only a few days after Chief Judge Parsons' April 7 order. The speed with which the microphones were placed should have alerted defendants to the possibility that the government might have begun the process of placing them prior to April 7, given defendants' knowledge of the security system.

pression of evidence offered by the government at trial.

## III

■ Defendants are entitled to suppress evidence only if they demonstrate that they have standing to assert the illegality of conduct alleged by Tickel. Since defendants claim that this conduct violates the fourth amendment,[10] they must demonstrate standing to assert a violation of the fourth amendment.

■ To establish standing defendants must show that the challenged conduct violated their own legitimate expectations of privacy. "[T]he defendant's Fourth Amendment rights are violated only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." *United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980) (emphasis in original). *See Rawlings v. Kentucky,* 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 129, 143–48, 99 S.Ct. 421, 423, 430–32, 58 L.Ed.2d 387 (1978). Fourth amendment rights are only infringed when something a person legitimately expects will remain private is at stake. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).

■ Applying these principles, it is clear that much of the conduct alleged by Tickel violates no fourth amendment interests of defendants. Tickel's entry into the offices on a pretext interview involved seeing nothing more than any visitor or customer would see, and the fourth amendment permits a government agent to pose as a customer and enter business premises open to customers of defendants. *See Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966).[11] Also, the agents' observations of Amalgamated from the parking lot infringed no expectation of privacy; the agents just observed what any passerby could see from the street. *See United States v. Scherer,* 673 F.2d 176, 181 (7th Cir.), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982).

■ Even as to Tickel's two surreptitious entries [12] into Amalgamated, defendants have failed to demonstrate their standing. While we have no doubt that defendants had a legitimate expectation of privacy in their own offices, *see Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), Tickel did not enter any of their offices; he was in only the exterior lobbies and corridors, the alarm room and the frame room. Defendants' legitimate expectations of privacy can only be violated by searches of areas they have sought to keep private by using them in a way that prevents them from being freely accessible to other people. *See, e.g., United States v. Haydel,* 649 F.2d 1152, 1154–55 (5th Cir.), *corrected,* 664 F.2d 84 (1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982); *Wilson v. Health & Hospital Corp. of Marion County,* 620 F.2d 1201, 1208–14 (7th Cir.1980); *United States v. Vicknair,* 610 F.2d 372, 380–81 (5th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 83, 66 L.Ed.2d 25 (1980); *United States v. Garcia-Rodriquez,* 558 F.2d 956, 960 (9th Cir.1977). No showing is made that any defendant

---

**10.** "The right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const.amend. IV.

**11.** Our court of appeals has twice recently reaffirmed this proposition. *See United States v.*

*Swart,* 679 F.2d 698, 701 (7th Cir.1982); *United States v. Scherer,* 673 F.2d 176, 181–82 (7th Cir.), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982).

**12.** We address only Tickel's first two entries because the third—Tickel's entry into Mr. Dorfman and Webbe's offices to plant the microphones—was done pursuant to court order and there is no contention that it was unlawful, absent prior unlawful behavior.

used the areas Tickel searched in any private way. Since no defendant worked in the areas Tickel searched, or used those areas in any private way, each lacks standing to challenge the search. *See United States v. Cella,* 568 F.2d 1266, 1283 (9th Cir.1977); *United States v. Cohen,* 516 F.2d 1358, 1366 (8th Cir.1975); *United States v. Britt,* 508 F.2d 1052 (5th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975); *United States v. Lefkowitz,* 464 F.Supp. 227, 230–31 (C.D.Cal.1979), *aff'd,* 618 F.2d 1313 (9th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980). *See also United States v. Cook,* 498 F.Supp. 1057, 1058–59 (S.D.Tex.1980), *modified and aff'd on other grounds,* 657 F.2d 730 (5th Cir.1981). For example, in *United States v. Alewelt,* 532 F.2d 1165, 1168 (7th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976), our court of appeals held that the defendant had no legitimate expectation of privacy in the outer area of his office where he had placed his coat on a coatrack.[13] Neither do defendants allege any proprietary interest in the premises searched which might accord them standing. *See Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978).[14] Since defendants have not shown that they used the areas searched in any way that created a legitimate expectation of privacy, they lack standing to challenge the search since it did not infringe their fourth amendment rights.[15]

■ Defendants argue that even if they lack standing to directly challenge the search, since it developed information used to place microphones and intercept their conversations, the conversations must be suppressed as fruits of a poisonous tree under the rule of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

While the interception of defendants' own conversations infringes their legitimate expectations of privacy, *see Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), in the instant motion defendants do not challenge the interceptions directly, but rather argue that the interceptions are the fruits of a prior fourth amendment violation which we have held they do not have standing to challenge. We know of no authority that holds that a defendant may suppress evidence seized from him as a fruit of a violation of fourth amendment rights which he does not have standing to challenge. There is ample au-

13. In *United States v. Rosenberg,* 416 F.2d 680 (7th Cir.1969), the court held that the defendant had standing to challenge the search of an office he did not work in because he was the person at whom the search was directed, relying on *Jones v. United States,* 362 U.S. 257, 260–61, 80 S.Ct. 725, 730–31, 4 L.Ed.2d 697 (1961), which it read to hold that a target of a search has standing to contest it. However, that aspect of *Jones* was repudiated in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). *Rosenberg* also appears to be inconsistent with *Alewelt.* Thus, we conclude that *Rosenberg* is no longer good law. *See also United States v. Cortina,* 630 F.2d 1207, 1215 n. 5 (7th Cir.1980).

14. Allen Dorfman, who is no longer a defendant, was the only individual in the case to assert a proprietary interest in Amalgamated. *See United States v. Dorfman,* 542 F.Supp. 345, 393 n. 56 (N.D.Ill.1982).

15. This holding is also supported by the line of cases holding that a search of common areas of secured apartment buildings does not violate any legitimate expectation of privacy of a tenant, since the areas Tickel searched were in effect common areas. *See United States v. Acevedo,* 627 F.2d 68, 69 n. 1 (7th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980); *United States v. Luschen,* 614 F.2d 1164, 1173 (8th Cir.1980); *United States v. Penco,* 612 F.2d 19, 24–25 (2d Cir.1979); *United States v. Eisler,* 567 F.2d 814, 816 (8th Cir. 1977); *United States v. Shima,* 545 F.2d 1026, 1029 (5th Cir.), *cert. denied,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 490 (1977); *United States v. Calhoun,* 542 F.2d 1094, 1100 (9th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977); *United States v. Cruz Pagan,* 537 F.2d 554, 557–58 (1st Cir.1976); *United States v. Anderson,* 533 F.2d 1210, 1214 (D.C.Cir.1976); *United States v. Freeman,* 426 F.2d 1351 (9th Cir.1970); *United States v. Conti,* 361 F.2d 153, 157 (2d Cir.1966), *vacated on other grounds,* 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968); *Polk v. United States,* 314 F.2d 837 (9th Cir.), *cert. denied,* 375 U.S. 844, 84 S.Ct. 96, 11 L.Ed.2d 72 (1963); *United States v. St. Clair,* 240 F.Supp. 338 (S.D.N.Y.1965). *But see United States v. Carriger,* 541 F.2d 545 (6th Cir.1976).

thority to the contrary. *See United States v. Chase,* 692 F.2d 69 (9th Cir.1982) (per curiam); *United States v. Congote,* 656 F.2d 971, 975–76 (5th Cir.1981); *United States v. Hansen,* 652 F.2d 1374, 1386–87 (10th Cir.1981); *United States v. Shovea,* 580 F.2d 1382, 1385–86 (10th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Tortorello,* 533 F.2d 809, 815 (2d Cir.1976); *Gissendanner v. Wainwright,* 482 F.2d 1293, 1297–99 (5th Cir.1973); *United States v. Brown,* 425 F.2d 1172, 1174 (9th Cir.1970) (per curiam); *Jacobs v. Warden,* 367 F.2d 321 (4th Cir.1966); *United States v. Agapito,* 477 F.Supp. 706, 713 (S.D.N.Y.1979) *aff'd,* 620 F.2d 324 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). *See also United States v. Davis,* 617 F.2d 677, 689–90 (D.C.Cir.1979). This rule has its origin in *Wong Sun* itself, where the Court held that heroin unlawfully taken from another was admissible against Wong Sun because the evidence had not been derived from a violation of his own rights. *Wong Sun* in turn was an outgrowth of *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1961), where the Court wrote,

> In order to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

*Id.* at 261, 80 S.Ct. at 731.

Here, defendants were not victims of Tickel's allegedly unlawful search. Their conversations were not seized as fruits of a violation of their own rights. Hence, they no more have standing to suppress fruits of those violations than did Wong Sun. While it was defendants' own conversations that were seized, allegedly as fruits of the earlier unlawful conduct, at bottom they seek suppression because someone else's rights were violated, and not because their own rights were violated. "In either case, the defendant 'claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.'" *United States v. Chase,* 692 F.2d 69, 70 (9th Cir.1982) (per curiam) (quoting *Jones,* 362 U.S. at 261, 80 S.Ct. at 730).

The purpose of standing rules is to prevent defendants from complaining of a violation of someone else's rights, and that is exactly what defendants are doing here—complaining that their conversations were seized because someone else's rights were earlier violated. The cases do not permit that. Since Tickel's initial searches infringed no protected privacy interest of defendants, use of their fruits likewise does not violate defendants' fourth amendment rights.

Defendants' final argument is that even if they lack standing to seek suppression of evidence under the fourth amendment, they have standing to move to suppress under Title III of the Omnibus Crime Control Act of 1968, as amended, 18 U.S.C. §§ 2510–20 (1976 & Supp. II 1978). Defendants first correctly point out that since their conversations were intercepted by the surveillance equipment installed by Tickel, they are "aggrieved persons" within the meaning of the statute, since "'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11) (1976). The statute goes on to give "aggrieved persons" the right to seek suppression of evidence.

> Any aggrieved person in any trial, hearing or proceeding in or before any court ... may move to suppress the contents of any wire or oral communication, intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—
>
> (i) the communication was unlawfully intercepted;
>
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a) (1976). Since no claim is made in the pending motion that Chief Judge Parsons' orders were insufficient on their face or that the interceptions were not made in conformity with the orders of authorization, defendants must argue that the fact that the microphone interceptions were made possible by Tickel's allegedly unlawful conduct means that the communications were unlawfully intercepted within the meaning of § 2518(10)(a)(i) and that the communications and all evidence derived therefrom must be suppressed.[16]

 Defendants' statutory argument suffers from the same flaws as their constitutional standing argument. Nothing in Title III governs Tickel's conduct directly; Title III governs only electronic surveillance. Nothing in the statute governs unlawful entries of property. Thus, Title III does not accord defendants standing to challenge the unlawful entries in themselves. See United States v. Scafidi, 564 F.2d 633, 638 (2d Cir.1977), cert. denied, 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 (1978).[17] Defendants therefore can argue only that their conversations were unlawfully intercepted because the interceptions were made possible by Tickel's earlier unlawful conduct which they do not have standing to challenge under Title III or the Constitution. This is exactly the same as the fruits of the poisonous tree argument we rejected above, and it must be rejected here as well. The suppression remedy contained in Title III was intended to be construed consistently with fourth amendment principles of standing. See Alderman v.

United States, 394 U.S. 165, 179 n. 9, 89 S.Ct. 961, 969 n. 9, 22 L.Ed.2d 176 (1969); Sen.Rep. No. 1097, 90th Cong., 2d Sess. 96 (1968), reprinted in 1968 U.S.Code Cong. & Ad.News 2112, 2185.[18] In Alderman, which was a wiretap case governed by Title III, the Court cited as controlling the principles of Wong Sun and Jones. See 394 U.S. at 472–76, 83 S.Ct. at 409–11. In an earlier appeal in this case, the court of appeals held that a person's standing under the statute is measured by whether his own privacy interests have been infringed by the interception, see United States v. Dorfman, 690 F.2d 1217, 1228–29 (7th Cir.1982), a test that tracks the constitutional requirement that defendants' legitimate expectations of privacy be infringed. Since standing under Title III tracks fourth amendment standing, the same principles which indicate that as a constitutional matter defendants lack standing to suppress conversations which were intercepted as the fruits of the violation of someone else's rights mean that defendants lack standing to assert statutory suppression. Indeed, a long line of cases have held that Title III does not confer standing to suppress one's own conversations when they are intercepted as fruits of a violation that one does not have standing to challenge. See United States v. Civella, 648 F.2d 1167, 1171–72 (8th Cir.), cert. denied, 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981); United States v. Williams, 580 F.2d 578, 583 n. 21 (D.C.Cir.), cert. denied, 439 U.S. 832, 99 S.Ct. 112, 58 L.Ed.2d 127 (1978); United States v. Fury, 554 F.2d 522, 525–26 (2d Cir.), cert. denied, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); United States v. Abramson, 553 F.2d 1164, 1170 (8th Cir.), cert. denied, 433 U.S. 911, 97 S.Ct.

**16.** *Since the oral interceptions allegedly made possible by the* alleged unlawful conduct were used to obtain surveillance authorizations subsequent to April 7, surveillance authorized by those orders must also be suppressed if the oral interceptions are suppressed. *See United States v. Giordano,* 416 U.S. 505, 529–33, 94 S.Ct. 1820, 1833–35, 40 L.Ed.2d 341 (1974).

**17.** Since Title III does not regulate entries, one court has questioned whether properly authorized electronic surveillance can ever be sup-

pressed under Title III, regardless of whether the surveillance equipment was unlawfully placed. *See United States v. London,* 424 F.Supp. 556, 560 (D.Md.1976), *aff'd sub nom. United States v. Clerkley,* 556 F.2d 709 (4th Cir.1977), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978).

**18.** In fact, this is the law of the case. *See United States v. Dorfman,* 542 F.Supp. 345, 393 n. 56, 394 (N.D.Ill.1982).

2979, 53 L.Ed.2d 1095 (1977); *United States v. Plotkin,* 550 F.2d 693, 694–95 (1st Cir.), *cert. denied,* 434 U.S. 820, 98 S.Ct. 61, 54 L.Ed.2d 76 (1977); *United States v. Wright,* 524 F.2d 1100, 1102 (2d Cir.1975); *United States v. Scasino,* 513 F.2d 47 (5th Cir.1975); *United States v. Lanese,* 385 F.Supp. 525 (N.D.Ohio 1974); *United States v. Ceraso,* 355 F.Supp. 126, 127 (M.D.Pa.1973); *United States v. Iannelli,* 339 F.Supp. 171, 177 (W.D.Pa.1972), *aff'd,* 477 F.2d 999 (3d Cir. 1973), *aff'd,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). *See also Scott v. United States,* 436 U.S. 128, 135 n. 10, 98 S.Ct. 1717, 1722 n. 10, 56 L.Ed.2d 168 (1978); *United States v. Phillips,* 479 F.Supp. 423, 433–37 (M.D.Fla.1979).[19] Since defendants' own expectations of privacy were not infringed by the allegedly wrongful conduct at issue, they lack standing to challenge the conduct, or suppress its fruits, under either Title III or the fourth amendment.[20]

■ Thus far our standing discussion has concerned the conduct described by Tickel at Amalgamated. The entries into the Sheraton-O'Hare hotel suite present a different situation. Defendant Williams alleges that he was staying in the suite. A guest in a hotel room has standing to contest an unlawful search of the room. *See Hoffa v. United States,* 385 U.S. 293, 301, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951). Accordingly, Williams has standing to complain of the entry into the Sheraton-O'Hare suite.

## IV

■ Assuming defendants have standing to challenge the conduct alleged by Tickel, not all of it was unlawful. As our holding on standing indicates, the observation of Amalgamated from the parking lot and the pretext interview infringe no interest protected by the fourth amendment or Title III. The use of the magnetic card and the offices .of the Milk Producers was also lawful. The uncontroverted affidavit of a representative of the Milk Producers indicates that he gave FBI agents permission to use the offices, card and the common areas of the building after they disclosed that they were agents and needed his assistance in their investigation. *See* Affidavit of James R. Box.[21] However, the government

---

19. The only authority that comes close to being to the contrary is *United States v. Scafidi,* 564 F.2d 633, 639 (2d Cir.1977), where the court assumed but did not decide that a defendant has standing to challenge surveillance made possible by an unlawful entry that the defendant did not have standing to contest. *Scafidi* overlooks *Fury* and *Wright,* however, which are earlier decisions of the same court to the contrary. Since *Scafidi* does not purport to even decide the question, it hardly could have overruled *Fury* and *Wright.* The only one of these cases defendants discuss is *Civella.* They characterize it as a case where nothing was ever seized from defendants. However, in *Civella* defendants were intercepted, and argued that the order authorizing the interception was tainted by prior unconstitutional conduct. That is exactly the same argument made here, and the *Civella* court rejected it. *See* 648 F.2d at 1172.

20. Since only Allen Dorfman had a proprietary interest in the premises searched, at most only he had standing to challenge the conduct at issue. Defendants try to argue that they were like lessees of Dorfman, and rely on Justice Jackson's view that tenants in a building have standing to challenge an unlawful entry. *See McDonald v. United States,* 335 U.S. 451, 458–59, 69 S.Ct. 191, 194–95, 93 L.Ed. 153 (1948) (concurring opinion). Not only was this view never adopted by the Court, but it is infected by reliance on property rights and notions of trespass and curtilage, which used to control the law of fourth amendment standing. This conceptual scheme was repudiated by the Court in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Under the privacy analysis of *Katz,* Justice Jackson's view must be rejected. If the search involved no private area, then it invaded no interest protected by either the fourth amendment or Title III.

21. Defendants do not claim Mr. Box is lying in his affidavit. Tickel does allege that the FBI obtained the Milk Producers' help by means of a "ruse," but does not describe the "ruse," nor do defendants explain why the "ruse" was unlawful. Finally, since Tickel does not claim any personal knowledge of the "ruse," he is not competent to testify on this subject, and any testimony he could give would be inadmissible hearsay. Thus, the Box affidavit is essentially uncontroverted.

concedes that warrantless entries into Amalgamated's offices and the hotel suite would have been unlawful. There is no question but that the fourth amendment prohibits warrantless entries into hotel rooms, *see United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and offices, *see Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968).[22]

## V

Again assuming that defendants have standing to challenge the conduct alleged by Tickel, the next question is whether the unlawful conduct alleged would, if proven, entitle defendants to suppress any of the evidence offered at trial. We will examine first the statutory basis for suppression, and later turn to the constitutional basis.

 The starting point must be the scope of the suppression remedy contained in Title III. We return to the analysis developed in the opinion on the original motion to suppress. Defendants may only suppress interceptions which would not have occurred but for the unlawful conduct. *See United States v. Dorfman,* 542 F.Supp. 345, 377 n. 30 (N.D.Ill.1982). This follows from *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1974), where the government did not name all the individuals for whom it had probable cause to believe were engaged in the criminal activity under investigation, in violation of 18 U.S.C. § 2518(1)(b)(iv) (1976). The Court held that this violation of the statute did not mean that the fruits of the interception had been "unlawfully intercepted" within the meaning of *id.* § 2518(10)(a)(i). The Court reasoned that had the government not violated the statute, and named all the individuals for which it had probable cause, it still would have been able to obtain judicial authorization for the surveillance and to intercept the conversations at issue.

Hence, the statutory violation in no way enabled the government to intercept conversations that it otherwise would not have intercepted and did not merit suppression of those conversations. *See id.* at 435–36, 97 S.Ct. at 671–72.

 Similarly, in *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), where the government misidentified the Department of Justice official who had approved the application for authorization of surveillance in the application, in violation of 18 U.S.C. § 2516(1) (1976), the Court held that since the government could have obtained authorization had it correctly identified the official, and since incorrect identification did not enable the government in that case to obtain interceptions it might otherwise not have obtained, suppression was unwarranted. *See id.* at 575–80, 94 S.Ct. at 1856–58.

The Supreme Court has written,

[W]e think Congress intended to require suppression where there is failure to satisfy any of these statutory requirements that *directly and substantially implement* the congressional intention to limit the use of intercept procedures to those situations calling for the employment of this extraordinary investigative device.

*United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974) (emphasis added). Thus, *Donovan* and its predecessors indicate that evidence is "unlawfully intercepted" within the meaning of § 2518(1)(a)(i) only where the government could not have obtained the evidence but for unlawful conduct.[23]

 Under this test, it is clear that the unlawful entry at the Sheraton-O'Hare does not entitle defendants to any statutory suppression. There is simply no allegation that this entry enabled the government to obtain

---

**22.** While warrantless entries may be permissible in exigent circumstances, no contention is made that such circumstances were present here.

**23.** Other courts have read *Donovan* and its predecessors this way. *See, e.g., United States*

*v. Feldman,* 606 F.2d 673, 680–81 (6th Cir. 1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980); *United States v. Picone,* 560 F.2d 998 (10th Cir.1977); *United States v. Acon,* 513 F.2d 513, 517–19 (3d Cir. 1975).

any of the evidence used at trial. None of the evidence obtained during the entry was introduced at trial and no claim is made that any of the evidence that was introduced at trial was a fruit of this entry. Thus, we need only consider the unlawful entries at Amalgamated in determining whether defendants, assuming their standing, are entitled to statutory suppression.

## VI

Defendants' first argument in support of statutory suppression is the fruits of the poisonous tree argument discussed above. The government's inability to obtain some of the evidence used at trial, but for the unlawful entries, would make that evidence "unlawfully intercepted" within the meaning of § 2518(10)(a)(i).[24] However, defendants' showing that the microphones could not have been installed in Dorfman's and Webbe's offices and the evidence used at trial could not have been obtained but for the illegality is deficient.

First, the Tickel affidavit and uncontroverted affidavits submitted by the government indicate that the FBI had independent sources for all of the information supplied by Tickel as a result of the unlawful entries. The affidavits indicate that the government was able to enter the building with the Milk Producers' magnetic card, that a confidential informant gave it information needed to defeat Amalgamated's alarm system, and that the phone company also gave it information that enabled it to defeat the system. The affidavits indicate that these independent sources not only could have been but in fact were used to

defeat the alarms and place the microphones after the April 7 order was issued.[25] Thus, defendants have not shown that the unlawful entries enabled the government to obtain evidence that it would not have lawfully obtained absent the illegality.

 Second, even if entries into Amalgamated were necessary to learn about Amalgamated's alarm system, there is no showing that they would not have been speedily accomplished legally after the April 7 order issued. It is clear that once an authorization for Title III surveillance issues, the government may surreptitiously enter the target's premises to plant microphones. *See Dalia v. United States,* 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979). In essence, the only conduct that we have held to be illegal is the two entries into Amalgamated, the first to observe the reception area, and the second to enter the alarm and frame rooms. There is no reason that, absent the earlier entries, the government would not have speedily and lawfully had Tickel enter the building and do exactly the same things he alleges he did earlier to enable the FBI to defeat the alarm system. Indeed, there is no reason it all could not have been done in one day, and no contention that, absent the unlawful entries, the government would not have installed the microphones as soon as was practicable. Certainly, there is no reason to believe that the government would not have performed the necessary entries by April 18,[26] which is the earliest oral interception which was offered at trial.[27] Thus, absent the earlier entries the FBI still would have developed the information to defeat the alarm system

---

**24.** *But see* note 17, *supra.*

**25.** Defendants argue that these affidavits may be false. However, they make no showing that that is the case; certainly nothing in the Tickel affidavit contradicts the claim that these independent sources of information existed, and as to the magnetic card and the phone company, the Tickel affidavit in large part corroborates the government's affidavits.

**26.** The Tickel affidavit does not allege that the FBI could not have defeated the alarms by April 18. Defendants speculate to that effect

by arguing that it was six months between the time Tickel first became involved in the case and the time the alarms were defeated. The explanation for this is clear—prior to April 7 there was no urgency about defeating the alarms and the agents were working on other cases. There is no showing that if it had to, the FBI would not have defeated the alarms in the period from April 7 to 18.

**27.** No contention is made that any interception prior to April 18 was material to any of the applications for electronic surveillance subsequent to April 7.

in time to intercept all of the conversations offered at trial. Finally, the Tickel affidavit indicates that the unlawful entries were entirely unnecessary. The parking lot surveillance revealed that the cleaning people left the doors unlocked, the alarm off and the offices unattended every day.[28] Tickel used this fact to enter the office the second time. That being the case, the FBI would easily have slipped into the offices and planted the microphones immediately after April 7 without ever having to defeat the alarm system. Thus, the government would have intercepted the conversations offered at trial absent the unlawful conduct. Suppression is unwarranted.

## VII

Defendants contend that the government's failure to disclose the unlawful entries in its April 7 application for a Title III authorization order violated 18 U.S.C. § 2518(1)(e) (1976). The statute requires disclosure of "all previous applications ... for authorization to intercept" conversations. The unlawful entries clearly were not "applications." However, while defendants concede that the government did not violate the letter of the statute, they argue that it undermined its underlying purpose. Congress intended the government to disclose prior applications since disclosure of a history of invasion of the target's privacy might make the judge more reluctant to authorize further surveillance. See United States v. Bellosi, 501 F.2d 833, 838–39, (D.C.Cir.1974).

Defendants' argument must be rejected for three reasons. First, it is at odds with the language of the statute. The statute requires disclosure of no more than prior "applications." We have previously construed the statute to require disclosure of no more than what it says on its face— prior applications for surveillance. See

United States v. Dorfman, 542 F.Supp. 345, 400 (N.D.Ill.1982).[29] We see no reason to depart from that holding.

Second, defendants' proposed construction of the statute is unworkable. Defendants propose that the statute be read as if it said "invasions of privacy" rather than "applications." No workable definition of "invasion of privacy" is proposed. The concept is so amorphous that it would be practically impossible for FBI agents to comply with the statute.[30]

Third, even if the statute were violated, this would not justify suppression. Had the FBI disclosed the prior entries to Chief Judge Parsons, it would have not provided any reason for him to refuse to authorize the surveillance. He could have ordered the FBI to use its independent sources of information to defeat the alarm system, or conduct additional entries to defeat the system after receiving authority. Because the FBI could have defeated the alarm system without relying on the unlawful entries, there is no reason to believe Chief Judge Parsons would have concluded that the April 7 application was tainted by the unlawful entries had they been disclosed to him. The failure to disclose the entries did not enable the government to obtain surveillance it would not have otherwise been able to obtain and hence does not merit suppression under § 2518(10)(a)(i).

## VIII

Defendants argue that the government's failure to disclose the unlawful entries to the Attorney General's designate violated 18 U.S.C. § 2516(1) (Supp. II 1978), which requires that the approval of the Attorney General or his designate be obtained before an application for electronic surveillance is submitted to a court. Defendants correctly note that the purpose of

---

**28.** The parking lot surveillance was entirely lawful. See parts III and IV, supra.

**29.** We know of no authority to the contrary. Even Bellosi, the only case on which defendants rely, involved an "application."

**30.** Moreover, if the concept were to be construed consistently with fourth amendment jurisprudence regarding legitimate expectations of privacy, then defendants' privacy had not previously been invaded for the reasons discussed in our holding on the standing issue.

the statute was to ensure that a senior official reviewed the application and determined that the proposed intrusion on the target's privacy was warranted before electronic surveillance was authorized. *See United States v. Giordano,* 416 U.S. 505, 515–23, 94 S.Ct. 1820, 1826–30, 40 L.Ed.2d 341 (1974). Defendants then argue that since the unlawful entries were not disclosed to the Attorney General's designate [31] he was deprived of an opportunity to consider the complete facts when evaluating the application and hence was unable to exercise his independent judgment in the manner Congress intended. Again, defendants' position lacks merit for three reasons.

First, the letter of the statute was complied with here. The Attorney General's designate did approve the applications, which is all the statute requires.[32] Moreover, Congress intended that beyond ensuring that the authorization was given, courts engage in no review of the authorization decision. The purpose of the statute was to have an official high enough in the Department of Justice to be subject to *political* checks and balances go on the line by authorizing the application. *See Giordano,* 416 U.S. at 520, 94 S.Ct. at 1829. Congress intended the political process, and not the courts, to hold the authorizing official responsible for his decision and to review that decision. Thus, § 2516(1) depends on political and not judicial review.

 Second, defendants' position is not supported by any authority. To the contrary, courts have consistently held that the government need not even demonstrate that the Attorney General or his designate personally reviewed the application or supporting materials before authorizing investigation. *See United States v. Bailey,* 607 F.2d 237, 241 (9th Cir.1979), *cert. denied,*

445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980); *United States ex rel. Machi v. United States Department of Probation and Parole,* 536 F.2d 179, 184 (7th Cir.1976); *United States v. Feldman,* 535 F.2d 1175, 1180–81 (9th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976); *United States v. Turner,* 528 F.2d 143, 150–51 (9th Cir.), *cert. denied,* 423 U.S. 996, 96 S.Ct. 426, 45 L.Ed.2d 371 (1975) *and* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976); *United States v. Acon,* 403 F.Supp. 1189, 1194–95 (W.D.Pa.1975); *United States v. Garramone,* 374 F.Supp. 256, 259–60 (E.D.Pa. 1974). If the statute is not violated when the Attorney General's designate does not even bother to look at the application, it could hardly be violated when not all the pertinent information is disclosed to him in the application and supporting materials.

Third, even if the statute had been violated suppression would not be warranted. If the unlawful entries had been disclosed, there is no reason to believe that the Attorney General's designate would have concluded that they should preclude the requested surveillance. Like Chief Judge Parsons, he could have concluded that the government nevertheless had lawful devices at its disposal for defeating the security system. There is no showing that the failure to disclose the entries enabled the government to intercept conversations it would not otherwise have been able to intercept.

## IX

Finally, we address defendants' constitutional arguments in favor of suppression. They fall into two categories.

 First, defendants contend that the failure to disclose the unlawful entries in

---

31. The Attorney General's designate here was former Assistant Attorney General Philip Heymann.

32. The Attorney General, or any Assistant Attorney General specifically designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an

order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of [crimes specified herein] . . . .

18 U.S.C. § 2516(1) (Supp. II 1978).

the April 7 application voids that application under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), which holds that a warrant application which contains intentional or reckless misstatements of fact is void under the fourth amendment.[33]

■ *Franks* is only violated by misrepresentations or omissions that are material to the application in the sense that the warrant would not have issued absent the misrepresentation or omission. *See United States v. Dorfman*, 542 F.Supp. 345, 365, 378 & n. 32 (N.D.Ill.1982). Under that standard the failure to disclose the entries was not material. The information derived from the entries was not relevant to the facts recited in the applications so it could hardly have been material to Chief Judge Parsons' decision to grant the application. Neither did any of the information learned during the entries detract from or negate the showing of probable cause made in the application. Moreover, as noted in part VI, *supra*, there is no reason to believe that Chief Judge Parsons would not have authorized the surveillance had the entries been disclosed. Since probable cause to conduct the surveillance still existed, and means independent of the unlawful entries existed for installation of the microphones, the unlawful entries would have had no effect on the decision Chief Judge Parsons had to make—whether the government had sufficient reason to invade defendants' privacy by intercepting their conversations.[34]

■ Second, defendants argue that suppression is constitutionally required because the installation of the microphones and interception of conversations by means of them is a fruit of the unlawful entries at Amalgamated and must be suppressed under the rule of *Wong Sun* discussed above. However, where there is a source for the evidence the government seeks to offer which is independent of the unlawful conduct, the fourth amendment does not require suppression of the fruits of an unlawful search or seizure. *See United States v. Crews*, 445 U.S. 463, 471–73, 100 S.Ct. 1244, 1249–51, 63 L.Ed.2d 537 (1980); *Alderman*, 394 U.S. at 183, 89 S.Ct. at 972; *Wong Sun*, 371 U.S. at 487, 83 S.Ct. at 417; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Our court of appeals has noted that this rule has three specific applications.

> [C]ontroverted evidence is not fruit of the poisonous tree when (1) the evidence was discovered by an independent source; (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that the connection has become so attenuated as to dissipate the taint; or (3) the evidence inevitably would have been gained even without the unlawful search.

*United States ex rel. Owens v. Twomey*, 508 F.2d 858, 865 (7th Cir.1974). *See also United States v. Piet*, 498 F.2d 178, 181 (7th Cir.1974).

■ Assuming defendants had standing to make this fruit of the poisonous tree argument, they would fail since this case fits into the first and third situations listed in *Owens*. First, the government had sources which it used to obtain the information necessary to defeat Amalgamated's security system and plant the microphones shortly after April 7 independent of the unlawful entries. *See* part VI, *supra*. Second, because the government was authorized to break into Amalgamated and do what was necessary to plant the microphones after the April 7 order was issued, the government would have been able to break into Amalgamated and duplicate the unlawful entries immediately after April 7, thus enabling it to defeat the security system and plant the microphones prior to the date of the first oral interception which was used at trial. *See* part VI, *supra*. Thus,

**33.** While *Franks* dealt only with misstatements contained within the four corners of the warrant application, we have previously held that it also reaches omissions. *See United States v. Dorfman*, 542 F.Supp. 345, 367–68 (N.D.Ill. 1982).

**34.** If anything, disclosure of the facts surrounding the entries would only have strengthened the showing of "need for surreptitious entry" made in the April 7 application, thereby enhancing the showing made by the government for issuance of the authorization order.

the government would have inevitably planted the microphones and intercepted the conversations that were used against defendants anyway, even absent the illegalities. For these reasons, none of the evidence used by the government need be suppressed as fruits of the unlawful entries at Amalgamated.[35] As noted above, defendants' argument to the contrary is premised on nothing more than speculation that the government would not have been able to plant the microphone promptly after the April 7 order. Nothing in the Tickel affidavit supports this position and the government's affidavits affirmatively refute it. Defendants

> are unable to suggest any specific basis in support of their claim that the government's evidence at trial might have been tainted.... Although the government has the ultimate burden of persuasion to show that its evidence is untainted, *Alderman v. United States*, 394 U.S. 165, 183 [89 S.Ct. 961, 972, 22 L.Ed.2d 176] (1969), nevertheless [defendants] must come "forward with specific evidence demonstrating the taint." *Id.* Under the circumstances of the present case, where [defendants] failed to provide some minimal demonstration of a basis for their allegation of taint, we cannot say that it [i]s improper for the trial court to decline to hold the extensive evidentiary hearings which [defendants argue are] required.

*United States v. DiMuro*, 540 F.2d 503, 511 (1st Cir.1976) (footnote omitted), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977).[36]

## X

■ The last basis on which defendants seek suppression is this court's supervisory power over the administration of justice. Because the government has engaged in misconduct in the course of the investigation that led to this prosecution, defendants argue that we should suppress its evidence.

Before analyzing the specific contentions, it must be borne in mind that the supervisory power "is not 'a chancellor's foot veto [by the District Court] over law enforcement practices of which it did not approve.'" *United States v. Payner*, 447 U.S. 727, 750–51, 100 S.Ct. 2439, 2453–54, 65 L.Ed.2d 468 (1980) (Marshall, J., dissenting) (quoting *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973)). Only if the government's misconduct has some nexus with the evidence offered against these defendants can the power be employed, since "this Court has no general supervisory authority over operations of the Executive Branch," *Payner*, 447 U.S. at 737, 100 S.Ct. at 2447 (Burger, C.J., concurring). *Cf. United States v. Hasting*, ___ U.S. ___, ___–___, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) (harmless error doctrine applies to the use of the supervisory power).

Bearing in mind the limitations of the supervisory power, we decline to exercise it in this case for two reasons.

First, because we have held that defendants lack standing to challenge the unlawful conduct at issue, exercise of the supervisory power is inappropriate. The Supreme Court squarely held as much in *Payner*, stating that the defendant's lack of fourth amendment standing also prevented him from invoking the supervisory power.

> Our Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices. [citing *Rakas* and *Alderman*] The value assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment.

---

**35.** As noted in part V, *supra*, the unlawful entry at the Sheraton-O'Hare did not generate anything that was used against defendants in this case. Thus, no evidence used by the government at trial need be suppressed as a fruit of that poisonous tree.

**36.** *United States v. Allard*, 634 F.2d 1182 (9th Cir.1980), relied on by defendants, is distinguishable because there no showing was made that the government would have obtained the allegedly tainted evidence absent the illegality. *See id.* at 1186–87 & n. 6.

447 U.S. at 736–37, 100 S.Ct. at 2447 (citations and footnote omitted). Because defendants do not have standing to challenge the unlawful conduct at issue,[37] we must reject the use of the supervisory power "as a substitute for established Fourth Amendment [standing] doctrine." *Id.* at 736 n. 8, 100 S.Ct. at 2446 n. 8.[38]

Second, defendants have not demonstrated a nexus between the unlawful conduct and the evidence used against them at trial. In *United States v. Cortina,* 630 F.2d 1207 (7th Cir.1980), on which defendants rely, the court began its discussion of the supervisory power issue by writing,

> One inescapable fact underlies the disposition of this appeal: the search here occurred only because [the government] lied to the magistrate. As the district court found, the affidavit lacked probable cause without its false assertions. This search never should have taken place.

*Id.* at 1213. That is not the case here. As our prior holdings have made clear, the government could have intercepted the conversations offered at trial even if the unlawful conduct had not occurred, either by using independent sources of information to defeat the alarm system, or by using surreptitious entries to learn about the system after Chief Judge Parsons had issued his orders. Nor did the government make any misrepresentations of fact to Chief Judge Parsons that were material to the decision he had to make on April 7. Had the entries been disclosed, there is no reason to believe his decision would have been any different. Because the evidence used at trial was not in any legally significant sense a product of the governmental misconduct there is no justification to suppress that evidence under the supervisory power. To do so would be to act not because of any effect the misconduct had on the judicial process but merely to express our disapproval of the government's behavior. That is exactly the sort of "chancellor's foot veto" which we should not exercise under the supervisory power.

### XI

Defendants have filed a number of motions for discovery in an attempt to obtain evidence which corroborates Tickel's affidavit and which they would use in the evidentiary hearing that they request on their motions for new trial. Since we have held that even if proven the Tickel allegations do not entitle defendants to a new trial there is no need for either discovery or an evidentiary hearing.

Defendants' motions for new trial and discovery are denied.

---

**37.** In *United States v. Cortina,* 630 F.2d 1207 (7th Cir.1980), the evidence at issue was seized directly from defendants; the defendants were themselves the victims of the challenged practices. *See id.* at 1215–16. Here, no evidence was seized from defendants themselves during the course of the unlawful entries and defendants lack a proprietary interest or an expectation of privacy in the areas searched. This case does not involve the kind of direct search and seizure of defendants' property present in *Cortina,* which was the basis on which *Cortina* distinguished *Payner.*

**38.** *See also id.* at 737, 100 S.Ct. at 2447 ("Were we to accept this use of the supervisory power, we would confer on the judiciary discretionary power to disregard the considered limitations of the law it is charged with enforcing. We hold that the supervisory power does not extend so far.").